Jo & Wo REALTY CORPORATION, Appellant-Respondent, v CITY OF NEW YORK et al., Respondents, and BOSTON PROPERTIES et al., Respondents-Appellants, et al., Defendant.

First Department, May 8, 1990

APPEARANCES OF COUNSEL

*Kenneth G. Schwarz* of counsel *(Richard S. Fischbein* and *Deborah J. Lotcizer* with him on the brief; *Fischbein Badillo Schwarz Barer Wiener Gruskin & Lederman,* attorneys), for appellant-respondent.

*Elizabeth Dvorkin* of counsel *(Alexandra Altman* with her on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for respondents.

*Robert P. LoBue* of counsel *(Paterson, Belknap, Webb & Tyler,* attorneys), for Metropolitan Transit Authority and another, respondents-appellants.

*Steven E. Landers* of counsel *(Robert A. Atkins* and *Beth Herstein* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for Boston Properties, respondents-appellants.

**OPINION OF THE COURT**

SULLIVAN, J.

This appeal presents the question of whether the municipal defendants, the City of New York and its Mayor, are prohibited from selling the site of the obsolete New York Coliseum without competitive bidding. At issue is a plan, seemingly consistent with both the current economic needs of the city and State and the historical origins of the site area, to redevelop the Coliseum site.

The City of New York originally acquired the Coliseum site in 1952 pursuant to the Columbus Circle Redevelopment Plan (Redevelopment Plan) drafted by the Committee on Slum Clearance Plans. When the Redevelopment Plan was formally adopted by the city's Board of Estimate on December 18, 1952, the site area, consisting of two city blocks on the west side of Columbus Circle between Broadway and Ninth Avenue from 58th to 60th Streets, was, on the basis of express findings made in accordance with the urban renewal law then in effect (General Municipal Law former § 72-k), found to be "substandard and insanitary". Despite numerous challenges to the city's findings, the designation of the site area as "substandard and insanitary" within the meaning of the urban renewal law was expressly upheld by the Court of Appeals. *(Kaskel v Impellitteri,* 306 NY 73, *cert denied* 347 US 934.)

Even before the Coliseum site was condemned, the Tribor-

ough Bridge and Tunnel Authority (TBTA) contracted with the city to purchase it for $2,182,230 on acquisition, and to develop it in accordance with the Redevelopment Plan. On January 15, 1953, pursuant to Public Authorities Law § 557-a (3), the Board of Estimate approved the sale, by the terms of which (TBTA Agreement) the city conveyed to the TBTA the use and occupancy of the tract for as long as the TBTA's corporate existence continues. After the conveyance, the TBTA constructed the Coliseum on the site, and has been its sole operator ever since.

Today, however, the Coliseum has lost its business to the new Javits Convention Center and stands vacant and virtually unused. In 1984, the TBTA and the city, having jointly determined that the Coliseum is obsolete and the site no longer necessary for their respective purposes, decided to sell the property for redevelopment. In 1985, they selected Boston Properties as the developer from among numerous applicants responding to a request for proposal (RFP). The TBTA, on behalf of itself and the city, thereafter entered into a purchase and sale agreement to sell the property to Boston Properties for $455,100,000. Although the latter offered the second highest bid, its redevelopment plan, in the judgment of the Board of Estimate and the TBTA, promised the highest economic benefit for the city overall and best advanced the goals of urban renewal. That determination, apart from the narrow question of competitive bidding, was not challenged and it is not at issue on this appeal.

The present ownership of the Coliseum site is defined not only by the public record but by statutory provision as well. The original total gross project cost of approximately $12,600,000 for the entire parcel, of which the Coliseum site is but a part, was financed by a Federal grant of approximately $6,000,000, local grants-in-aid of approximately $3,000,000, a capital value of approximately $192,000 allocated to land retained by the city and the proceeds, $3,421,222, of sales of project land by the city. The latter figure included the $2,182,230 which the TBTA paid the city for that portion of the project that became the Coliseum site. When, as here, the TBTA acquires at its expense real property from or in the name of the city, it obtains the use and occupancy of that property for "so long as its corporate existence shall continue". (Public Authorities Law § 553 [4]; § 557-a [2].) Moreover, in the two deeds which transferred the site, the TBTA was granted "the use and occupancy" of the Coliseum site "for so

long as the [TBTA's] corporate existence * * * shall continue." Thus, the property would revert to the city by operation of law only if the TBTA ceases to exist. (Public Authority Law § 552 [2].) Furthermore, when and if the TBTA determines that its interest in the property is no longer necessary for its corporate purposes, as has occurred here, the statute authorizes it to sell the property. (Public Authorities Law § 553 [4-a] [b].)

The Redevelopment Plan's urban renewal program for Columbus Circle was designed to remain in effect for 40 years after construction of the Coliseum. The Redevelopment Plan, as adopted by the Board of Estimate in 1952, itself provides, "No increase in density or change in land use shall be made for a period of 40 years except upon the approval of the Board of Estimate of The City of New York." In section 506 of the TBTA Agreement, and again in both deeds conveying the Coliseum site, the TBTA expressly covenanted "[t]o devote the land to the uses specified in the redevlopment *plan* * * * as said plan may exist from time to time for a period of forty (40) years from the completion of the *project"* (emphasis added).

It should be noted that both the TBTA Agreement and the deeds draw a clear and significant distinction between the Redevelopment Plan and the project. In contrast to the 40-year plan, the "project" referred to is the construction of the Coliseum building itself which, according to section 304 of the TBTA Agreement,* would be deemed complete on the date when the certificates of occupancy were issued. All parties agree that the construction project was complete in 1956. In a clear manifestation of a contemporary understanding that the urban renewal plan was subject to amendment and the site subject to changes in use even after completion of the project, the Board of Estimate, within a year following completion of construction of the original Coliseum project, adopted the First Amendment to the Redevelopment Plan for the purpose of revising permitted uses of the site and approving a supplemental agreement between the city and TBTA authorizing such revisions. The amending resolution indicated that the Coliseum is "now constructed".

In deciding to sell the Coliseum for redevelopment, the city

---

* Insofar as is relevant, section 304 of the TBTA Agreement provided: "Completion of the project shall mean the date on which there shall have been issued by the Department of Housing and Buildings of the City of New York certificates of occupancy for the Coliseum buildings provided in the plan of said project."

and the TBTA concluded that it was obsolete and would, contrary to the Redevelopment Plan, adversely affect the site and surrounding area. In strict compliance with the urban renewal statute, General Municipal Law § 502 (3), the Board of Estimate, after finding that the Coliseum site was again "in danger of becoming a substandard or insanitary area and tend[ed] to impair or arrest the sound growth and development of the municipality", amended the urban renewal plan. The materials and testimony submitted to the Board of Estimate—including the environmental impact statement, the City Planning Commission report and the Second Amended Urban Renewal Plan prepared by the Department of Housing Preservation and Development—amply support the Board's determination that because of the opening of the Javits Convention Center in 1986, "the Coliseum is now obsolete and vacant". Moreover, the Board of Estimate determined that "an unutilized or underutilized Coliseum will have a detrimental effect on the surrounding area and will tend to impair or arrest the sound development of the City." Similarly, that determination was not challenged in the complaint herein.

■ Since, as will be demonstrated, the sale could proceed without competitive bidding, the TBTA and the city were not required to use any particular method to select a sponsor qualified under the Urban Renewal Law. (See, General Municipal Law § 507.) Of the many options available to them, they chose to employ the RFP method, a well-established alternative to competitive bidding (see, Matter of Citiwide News v New York City Tr. Auth., 62 NY2d 464; Matter of Burroughs Corp. v New York State Higher Educ. Servs. Corp., 91 AD2d 1078, lv denied 58 NY2d 609), which affords the government the flexibility, in ways not possible with competitive public bidding, to achieve the greatest economic benefit in dealing with prospective contractors, developers and franchisees.

■ Jo & Wo Realty Corporation, plaintiff herein, commenced this taxpayer's action in 1987 pursuant to General Municipal Law § 51 to enjoin the proposed sale of the Coliseum site to Boston Properties on the ground that the city failed to comply with the competitive bidding requirements of section 384 (b) of the New York City Charter. After joinder of issue, defendants moved for summary judgment, which the motion court granted. In dismissing the complaint in its entirety, the court ruled that the Coliseum site is still governed by the Redevelopment Plan's 40-year urban renewal program and, thus, may, pursuant to the Urban Renewal Law

(General Municipal Law § 500 *et seq.)* be sold without competitive bidding (140 Misc 2d 154). We agree.

Pursuant to section 384 (b) (1) of the New York City Charter, the city is required to sell its real property interests to the highest bidder, "[e]xcept as otherwise specifically provided by law". Such a specific exception may be found in the State's Urban Renewal Law (General Municipal Law § 507 [2]), which provides:

"Notwithstanding anything to the contrary contained in this article and notwithstanding the provisions of any general, special or local law applicable to the sale of real property by a municipality * * * real property [acquired pursuant to the Urban Renewal Law] * * * may be sold * * * for the effectuation of any of the purposes of the urban renewal program in accordance with the urban renewal plan * * *

"(d) to any person, firm or corporation designated by the agency as a qualified and eligible sponsor * * * without public auction or sealed bids".

Thus, the Urban Renewal Law explicitly authorizes the sale of property to an applicant which does not necessarily offer the highest price but proposes to develop the property in accordance with the purposes of the site's urban renewal program. As this record discloses, the city routinely conveys urban renewal sites without competitive bidding. And, as the motion court found, "this sale clearly effectuates the purpose of the urban renewal program in accordance with the urban renewal plan *(supra,* 140 Misc 2d, at 160)". In fact, the complaint does not allege otherwise.

In the face of such clear statutory authority for the sale of the Coliseum site without competitive bidding, plaintiff offers only two arguments, namely, that the sale should not be governed by General Municipal Law § 507 (2), but rather, by the old urban renewal statute, General Municipal Law former § 72-k; or alternatively, that the site is no longer urban renewal property and therefore not subject to the Urban Renewal Law. It should be noted that the old statute, which required competitive bidding, was repealed by the Legislature over 25 years ago in favor of the modern Urban Renewal Law (General Municipal Law art 15), which governs the current conveyance of the Coliseum site.

In an attempt to avoid the plain meaning of the modern Urban Renewal Law, plaintiff contends that since the Redevelopment Plan was originated under the old urban renewal

statute, the site can only be conveyed pursuant to the provisions of former section 72-k of the General Municipal Law, notwithstanding its repeal in 1961 by General Municipal Law § 525. This argument is flatly contradicted by the relevant provision of the current Urban Renewal Law's saving clause, "Nothing herein contained, however, shall prevent a municipality, having so commenced or undertaken an urban renewal program prior to the effective date of this article, from exercising any of the rights or powers granted in this article in conjunction with or substitution of the rights and powers of such municipality under any law in force immediately prior to the effective date of this article, until the completion of such program." (General Municipal Law § 523 [1].)

As the legislative history of the enactment discloses, an express purpose of the revised law was to provide municipalities with more flexible alternatives to competitive bidding. Supporters of the new statute argued that making price the sole determinant in every urban renewal project seriously hindered the ability of the administration adequately to consider the public interest. Thus, while the saving clause preserves any rights and powers that existed under the earlier statute, it also expressly authorizes the city to substitute the rights and powers created by the modern Urban Renewal Law. *(See, Matter of City of Rochester [Maxlene Realty],* 35 Misc 2d 974 [city may exercise its newly granted authority under article 15 over the objection of the owner of land condemned under former section 72-k].) The city's decision to sell the Coliseum site without competitive bidding is, of course, one of those rights and powers. We note parenthetically that "competitive bidding requirements impose a substantial restriction upon the activities of public entities and must be extended no further than reasonably contemplated by the Legislature". *(Matter of Citiwide News v New York City Tr. Auth.,* 62 NY2d 464, 472, *supra.)*

■ Plaintiff concedes that pursuant to the saving clause an urban renewal program can be "governed either by the old law or by the new law, as the municipality sees fit", but argues that the saving clause limits the option to employ either law to those projects which had not been completed as of the effective date of the new law. It further contends that the Coliseum site's urban renewal program did not survive completion of the construction of the Coliseum in 1956. This argument ignores the 40-year development restrictions imposed on the Coliseum site by the terms of the Redevelopment

Plan, the TBTA Agreement with the city, the resolutions of the Board of Estimate, and the deeds conveying the property to the TBTA. Moreover, it confuses the plain language of the Urban Renewal Law's saving clause, which permits the city to sell the Coliseum site without competitive bidding, not, as plaintiff contends, until completion of the "project", but "until the completion of such program" (General Municipal Law § 523 [1]).

That the construction of the Coliseum project was completed in 1956 is, therefore, of no legal relevance in determining whether the original urban renewal program is still in existence. What is determinative is that the original urban renewal plan or program is not complete. When the TBTA first acquired the Coliseum site in 1952, it covenanted "[t]o devote the land to the uses specified in the redevelopment plan * * * as said plan may exist from time to time for a period of forty (40) years from the completion of the project." The completion of the project, i.e., the construction of the Coliseum building and the issuance of certificates of occupancy by the New York City Department of Housing and Buildings, did not signal the termination of the urban renewal plan, but marked the beginning of its 40-year existence.

■ To argue, as the dissent does, that the Columbus Circle urban renewal program's 40-year land use and density restrictions were intended solely to insure the repayment of the project's borrowed funds is to ignore the Redevelopment Plan's data concerning "deterioration of buildings, age of existing buildings, excessive land coverage and inadequate light and air indicating that the * * * area is a substandard insanitary area." The Board of Estimate's December 18, 1952 resolution approving the Redevelopment Plan's ban on any increase in density or change in land use for 40 years except upon the Board's approval was an obvious response to that finding of blight. Moreover, the Plan "conform[ed] to the general plan for the City as a whole" and "the land uses for the area [were] consistent with such plan," thus complying with the requirements of title I of the National Housing Act of 1949 that a "redevelopment plan" financed, in whole or in part, by Federal funds "indicate its relationship to definite local objectives as to appropriate land uses * * * and * * * indicate proposed land uses and building requirements in the project area". (42 USC § 1460 [former (b)].)

■ ■ Plaintiff also suggests that the city was not empowered to extend the urban renewal program beyond completion

of construction of the Coliseum project. The life-span of the urban renewal plan was approved in 1952, however, and the time to challenge that determination expired more than 35 years ago. Even if the claim could be raised in this proceeding, nothing in the statute or case law restricts the length of urban renewal programs. To the contrary, section 520 of the General Municipal Law states, "This article shall be construed liberally to effect the purposes hereof". Since the purposes of urban renewal cannot be achieved overnight, the original Redevelopment Plan prohibited increases in density or changes in use for 40 years, which, as plaintiff concedes, was the customary life-span of all such urban renewal projects. The Urban Renewal Law plainly contemplates that an urban renewal plan will not end with construction of the original project. For example, section 507 (2) (c) of the General Municipal Law refers to a qualified sponsor and his proposed "use or reuse of the urban renewal area or of the applicable portion thereof". Obviously, a "reuse" would be unlikely if the plan were deemed to terminate when construction of the original buildings was complete. Such a "reuse" is precisely what is taking place here with the sale of the Coliseum site to a qualified sponsor.

Finally, on this point, plaintiff insists that even if the urban renewal plan's 40-year program remains in effect, the city should still have applied the repealed statute and utilized competitive bidding. If, however, as plaintiff concedes for the sake of argument, the site is still subject to an urban renewal program, the saving clause (General Municipal Law § 523 [1]), explicitly permits the current Urban Renewal Law to control.

The two cases upon which plaintiff relies, *Matter of Park W. Vil. Assocs. v Abrams* (127 Misc 2d 372, *affd* 104 AD2d 741, *affd* 65 NY2d 716) and *Matter of Coliseum Park Apts. Co. v Abrams* (104 AD2d 741, *affd* 65 NY2d 716), do not hold otherwise. The only similarity between these cases and the instant controversy is that the urban renewal plans at issue in *Park W.* and *Coliseum Park* contained 40-year land use limitations similar to the Coliseum site's plan. The decisions held that, when rental apartments constructed on urban renewal land are converted to condominium or cooperative ownership, Board of Estimate approval is not required. From this, plaintiff, without any basis therefor, infers that the cases stand for the proposition that the Urban Renewal Law does not apply to the sale and redevelopment of the Coliseum site.

In *Park W.,* the court considered a redevelopment plan, also

adopted in 1952, which, like the Coliseum plan, contained a 40-year covenant devoting the land to the uses specified in the urban renewal plan and prohibiting increases in density or changes in land use. The court did not, as plaintiff implies, rule that the urban renewal program was at an end, but rather interpreted the restrictions contained in the plan, finding that the continuing urban renewal program did not restrict "the type of ownership or occupancy of the apartments." *(Matter of Park W. Vil. Assocs. v Abrams, supra,* 127 Misc 2d, at 376.) Moreover, unlike this case, in *Park W.* the city had sold its interest in the property in the 1950's. The court still found that the urban renewal program was operative. In fact, the court held that the phrase "as said plan may exist from time to time" (which appeared in the development contract there as it does in the TBTA Agreement here) specifically "contemplated" revisions to the plan. *(Supra,* at 380-381.) Thus, in *Park W.,* a plan adopted in 1952 was, after completion of construction, amended in 1955, and again revised in 1961, and the amendments given effect by the court. In *Coliseum Park (supra),* the court was faced with virtually the same issue. As in *Park W.,* the court gave effect to a plan which was conceived over 30 years before.

Plaintiff argues that, even if the urban renewal program for the Coliseum site was not completed under former section 72-k of the General Municipal Law, its sale would be governed by the modern Urban Renewal Law only if the city redesignated the area as "substandard and insanitary" and therefore "appropriate for urban renewal". The Coliseum site area was found to be "substandard or insanitary" when, based on findings made pursuant to the then existing urban renewal statute, the Board of Estimate first adopted the urban renewal plan in 1952. The findings of blight were tested in court and expressly upheld. *(Kaskel v Impellitteri,* 306 NY 73, *supra.)* While a designation of blight is required at the inception of the process, neither the repealed nor the current urban renewal laws require that the Board of Estimate make a second finding of blight in order to resell and reuse urban renewal property in accordance with the purposes of the plan. Even assuming, however, that a second finding of blight were necessary, such a finding was in fact made by the Board of Estimate when it amended the urban renewal plan and approved the sale of Boston Properties.

In determining whether an area is a fit subject for urban renewal, the city need only find that the area "is in danger of

becoming a substandard or insanitary area and tends to impair or arrest the sound growth and development of the municipality." (General Municipal Law § 505 [4] [a].) And, plaintiff's opinion that the goals of the urban renewal plan have been achieved notwithstanding, the area need not be a slum to fall within the continuing requirements of the statute. The definition of "blighted" is "liberal rather than literal". *(Yonkers Community Dev. Agency v Morris,* 37 NY2d 478, 483, *appeal dismissed* 423 US 1010.) Thus, the city is entitled to consider such circumstances as improper land use, "outmoded and deteriorated structures" and unutilized development rights as factors supporting a determination of potential "blight". *(Supra,* at 483; *see, Cannata v City of New York,* 11 NY2d 210, 213, *appeal dismissed* 371 US 4.) These are precisely the factors, supported by a voluminous public record, that the Board of Estimate considered in determining that the new Javits Convention Center rendered the Coliseum outmoded, underbuilt and unutilized and that such obsolescence would have an adverse effect on the surrounding area.

■ Nor is plaintiff's belief that amending the Coliseum site urban renewal plan was "questionable" any basis for reversal. As already noted, the complaint does not challenge the amendment to the urban renewal plan. Moreover, the scope of judicial review of a Board of Estimate determination of blight —assuming such a determination had to be made here and assuming plaintiff properly challenged that determination—is extremely limited. When the Board of Estimate and City Planning Commission make "substandard and insanitary" determinations for urban renewal purposes and do not act "corruptly or irrationally or baselessly, there is nothing for the courts to do about it, unless every act and decision of other departments of government is subject to revision by the courts". *(Kaskel v Impellitteri, supra,* 306 NY, at 78.) Since, however, plaintiff never challenged the Board of Estimate's urban renewal findings, the city's determination to amend the Coliseum site urban renewal plan is, in any event, beyond judicial review.

■ In further criticism of the Board of Estimate's determination, plaintiff argues that it failed to make a finding that financial aid was necessary to redevelop the site. This argument is patently meritless. Section 505 (4) (b) of the General Municipal Law does not, as is suggested, require that the municipality receive financial aid in order to proceed with an urban renewal plan. Thus, it is hardly required to seek

financial aid in a "reuse" of the urban renewal property. The statute merely requires a finding of necessity with respect to any aid "to be provided" before a program can be approved. (General Municipal Law § 505 [4] [b].) If no aid is to be provided, then a finding of necessity is obviously not required.

■ The proposed sale of the Coliseum site without formal competitive bidding is authorized as well on statutory grounds entirely independent of General Municipal Law § 507 (2). Section 553 (4) of the Public Authorities Law enables the TBTA to acquire property in the name of the city and "to use the same so long as its corporate existence shall continue". Public Authorities Law § 557-a (3) further permits the city to convey to the TBTA by deed "the use and occupancy" of real property "for so long as [the TBTA's] corporate existence shall continue". The two deeds which transferred the Coliseum site to the TBTA in 1952 adopted verbatim the language of these sections and conveyed the use and occupancy of the site to the TBTA for an indefinite and self-perpetuating period. Pursuant to Public Authorities Law § 552 (2), the TBTA's corporate existence will continue until "all its liabilities have been met and its bonds have been paid in full"—a time which will not come for at least another 30 years and may never arrive since the TBTA has no plans to cease operations or discontinue issuing bonds.

As part of this cohesive statutory scheme, Public Authorities Law § 553 (4-a) authorizes the TBTA, in behalf of the city, to sell any property which was acquired by the city at the TBTA's expense. In pertinent part, the statute provides, "Whenever any real property is determined by the [TBTA] to be unnecessary for its corporate purpose * * * (b) [the TBTA is authorized] to sell and convey or lease in behalf of such city any real property acquired by the city at the expense of the authority." In accordance with the provisions of paragraph (b) of Public Authorities Law § 553 (4-a), the present purchase and sale agreement for the Coliseum site was executed by the TBTA as seller for itself and "in behalf of" the city.

Nothing in the statutory provisions governing the TBTA requires it to sell its real property interests through competitive bidding. It is well established that the TBTA is "free * * * from restraints otherwise applicable to agencies of the government". (Matter of New York Post Corp. v Moses, 10 NY2d 199, 205.) Like other public authorities, it is a statutory creature and "stands on its own feet, transacts its business affairs through its own personnel and on its own initiative and

is not subject to the strict requirements imposed upon a board or department of the State". *(Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth.,* 5 NY2d 420, 424-425.) Thus, unless specifically mandated by express provision of law, public authorities like the TBTA are not required to utilize competitive bidding. *(Matter of New York City Chapter, Inc. of Natl. Elec. Contrs. Assn. v Fabber,* 73 Misc 2d 859, 864, *affd* 41 AD2d 821; *Matter of Marino v Town of Ramapo,* 68 Misc 2d 44, 55.)

In order to avoid the impact of the Public Authorities Law, plaintiff attempts to disparage the TBTA's interest in the Coliseum site by suggesting that the site is actually owned by the city, not the TBTA, and arguing it may therefore be sold only to the highest bidder. Specifically, plaintiff contends that the city conveyed, "not an interest in the land, but only the right to use and occupy the land" pursuant to Public Authorities Law § 557-a (2). However the ownership interests are labeled, the Public Authorities Law governs the disposition of the property. Whenever the TBTA acquires real property from or in the name of the city, it statutorily holds such property precisely as it does here, i.e., the use and occupancy for "so long as its corporate existence shall continue". (Public Authorities Law § 553 [4]; § 557-a [2].) Thus, the two deeds conveying the Coliseum site, drafted to conform to the statute's requirements, left the city with only a statutory contingent reversionary interest in the property. The very same statute declares that the TBTA is authorized to sell, in behalf of the city, "any real property acquired by the city at the expense of the [TBTA]." (Public Authorities Law § 553 [4-a] [b].)

The dissent's conclusion that the TBTA's payment of approximately $2.2 million to the city was made, not to acquire title to the Coliseum site, but in consideration of the TBTA's acquisition of the use and occupancy of this site is belied by the record. The TBTA's $2.2 million payment is part of the proceeds from the sales of project land listed in the city's "Certificate of Completion and of Gross and Net Project Cost" and was used therein to arrive at a net project cost. Title I of the National Housing Act of 1949, applicable here because of Federal financing, defined a "net project cost" as "the difference between the gross project cost and the aggregate of (1) the total sales price of all land * * * sold". (42 USC § 1460 [f].) Therefore, the TBTA's payment was used to reduce the initial acquisition costs, thereby bringing the original purchase of the

Coliseum site within the purview of Public Authorities Law § 553 (4-a). The dissent also argues that the TBTA's $2.2 million payment cannot be deemed to satisfy the requirement that the property be acquired "at the expense of the authority" (Public Authorities Law § 553 [4-a] [b]), since it represents only about 16% of the full acquisition cost. The 16% figure is, however, misleading since the $2.2 million was paid specifically for the acquisition of the Coliseum site. Even if this parcel were more valuable than the "slum" property in the western portion of the project area, it still comprised only a portion of the entire two-block parcel.

Thus, since the site was acquired at the TBTA's expense and the city conveyed its use and occupancy to the TBTA, the TBTA may sell it and is not required to do so by competitive bidding. Were the outcome any different, section 553 (4-a) (b) would be a nullity because it would forever deny the TBTA the power to sell real property acquired from, or in the name of, the city.

The operation of section 553 (4-a) makes sense in the context of the statutory scheme governing the TBTA. The TBTA paid for the Coliseum site and has used, occupied and operated it since 1953, and is entitled to do so indefinitely. With respect to its decision to sell the site, the Legislature has provided a mechanism for it to do so, "in behalf of such city", and the TBTA has done so here with the city's consent. Indeed, that legislative will would be frustrated if section 384 of the New York City Charter were construed to limit the TBTA's authority to convey the property without competitive bidding.

Accordingly, the order of the Supreme Court, New York County (David B. Saxe, J.), entered August 29, 1988, granting defendants' motion for summary judgment dismissing the complaint, should be affirmed, without costs or disbursements.

ROSENBERGER, J. (dissenting). The issue in this appeal is whether defendant-respondent the City of New York (the City), has complied with the legal requirements governing dispositions of city-owned property in its sale of the Coliseum site at Columbus Circle in Manhattan to defendant-respondent Boston Properties.[1] Plaintiff-appellant commenced this taxpayer's action pursuant to General Municipal Law § 51 to enjoin

---

1. Defendants-respondents-cross-appellants have abandoned their cross appeal and only seek affirmance of the Supreme Court order which granted their motion for summary judgment.

the proposed sale on the ground that the City failed to comply with the competitive bidding requirements of the New York City Charter § 384 (b).[2] Respondents successfully moved for summary judgment dismissing the complaint (140 Misc 2d 154), arguing that two other provisions of law specifically authorize alternatives to competitive bidding for disposition of the site.

Contrary to the conclusion reached by my colleagues who would affirm the order appealed from, I find that respondents have failed to establish their entitlement to summary judgment, as a matter of law. I do not agree that the record herein establishes that the City's interest in the Coliseum site was acquired "at the expense of" respondent Triborough Bridge and Tunnel Authority (TBTA) and, consequently, could be sold by the TBTA on behalf of the City without competitive bidding pursuant to Public Authorities Law § 553 (4-a) (b), as the majority has found. Nor can I agree with the construction of the Urban Renewal Law (General Municipal Law art 15), urged by respondents and accepted by both Supreme Court and the majority herein.

The claim that the original Columbus Circle *project*—a Federally funded project under the now defunct title I housing program—has not been completed because the original redevelopment *plan* for the project area prohibits changes in land use or increases in density for a period of 40 years, cannot withstand scrutiny. This argument completely ignores the clear statutory distinction between an urban renewal "plan" and an urban renewal "project or program". *(Cf.,* General Municipal Law § 502 [3], [7].) These terms define functionally distinct aspects of the urban renewal scheme, delineating the phase of active governmental involvement, during which special rights and power are conferred upon the municipality undertaking the project, from the phase in which the urban renewal property is turned over to a private developer who is contractually obligated to develop and maintain the property in accordance with the urban renewal plan.

It is during the "project" phase that the municipality may exercise the rights conferred by the Urban Renewal Law in

2. Section 384 (b) of the New York City Charter reads as follows:

"Except as otherwise specifically provided by law:

"1. The board of estimate may authorize the sale or lease [of city-owned real property] only for the highest marketable price or rental, at public auction or by sealed bids and after advertisement".

derogation of the municipal charter. Thereafter, the ordinary zoning and police powers of the municipality are sufficient to ensure compliance with the urban renewal plan by the private developer. Once the urban renewal property is conveyed to the private developer, no further recourse to the special urban renewal powers is necessary to enforce or modify the plan and no further recourse is sanctioned under the Urban Renewal Law unless a new statutory finding is made, based upon current conditions, declaring the area appropriate for urban renewal. For the reasons discussed below, I reject respondents' claim that the original title I *project* is viable under the current Urban Renewal Law and I find nothing in the record to support their claim that the Coliseum site—which borders Central Park at an intersection of prime residential and commercial districts—is threatened with economic deterioration because existing or imminent conditions in the area discourage builders and investors from developing the site.

### HISTORY OF THE URBAN RENEWAL PROJECT

The Coliseum, completed in 1956, was part of the Columbus Circle urban renewal—or "slum clearance" as it was then called—project. In December 1952, the Committee on Slum Clearance Plans, chaired by Robert Moses (who was then also president of respondent TBTA), issued its "Slum Clearance Plan under Title I of the Housing Act of 1949" for the redevelopment of two city blocks on the west side of Columbus Circle between Broadway and Ninth Avenue from 58th to 60th Streets.

The plan, adopted by the Board of Estimate on December 18, 1952, called for the creation of one "superblock" by the demapping of 59th Street. Two residential apartment buildings were to be built on the westernmost part of the site, and a public convention and exhibition hall was to occupy the remainder of the site nearest to Central Park. The City entered into agreements with a private developer to build the residential buildings and with respondent to build and operate the Coliseum. The TBTA also contracted to receive the rights of use and occupancy for the Coliseum site for the duration of the TBTA's corporate existence.

The Columbus Circle project was undertaken in accordance with the powers conferred by General Municipal Law former § 72-k which was repealed in 1961 and replaced by article 15 of the General Municipal Law (§ 500 *et seq*). Former section

72-k empowered municipalities to acquire "substandard and insanitary" real property by condemnation and then to sell or lease the property for redevelopment "at the highest marketable price or rental at public auction or by sealed bids". This section also authorized municipalities to seek Federal assistance in the form of loans and grants under title I of the Housing Act of 1949 for "Slum Clearance and Community Development and Redevelopment" (see, Housing Act of 1949 ch 338, 63 US Stat 413 [codified as amended at 42 USC § 1450 et seq.]) (the Act).

Under title I of the Act, the Federal Government provided two thirds of the difference between the cost of acquiring land in substandard and insanitary areas and preparing it for redevelopment, and the price paid to the municipality by the sponsor or private developer who would ultimately complete the project in accordance with the approved urban renewal plan (42 USC § 1453 [1949]). The State and municipal government programs paid the remaining one third of these costs (42 USC § 1454 [1949]; General Municipal Law former § 72-k [3] [2]).

The primary purpose of the State and Federal urban renewal programs was to provide cities with the necessary financial assistance for acquiring property which had become or was in danger of becoming "substandard and insanitary", and of conveying the property to a private sponsor for redevelopment pursuant to an approved plan. (See, Matter of Park W. Vil. Assocs. v Abrams, 127 Misc 2d 372, 379 [Sup Ct, NY County 1984] ["The National Housing Acts are essentially financing acts"], affd 104 AD2d 741 [1st Dept], affd 65 NY2d 716 [1985]; see also, Waite, Nonresidential Urban Renewal in New York, 10 Buffalo L Rev 265, 296-303 [1960-1961].) Such governmental assistance was necessary because the cost of assembling and clearing sites in blighted areas was uneconomic and fraught with risks which deterred private development in these areas. The Legislature's findings in support of article 15 declare: "[T]hat by reason of such [substandard and insanitary] conditions * * * property owners in such areas lack the incentive or means to properly maintain, improve or redevelop their separate parcels and that the continuance of such environmental conditions results in * * * health and safety hazards which * * * discourage builders and investors from developing the area". (L 1961, ch 402, § 1 [3]; see also, Cannata v City of New York, 11 NY2d 210, 213 [1962] [discussing purpose of General Municipal Law former § 72-n, the

urban renewal statute applicable to vacant land], *appeal dismissed* 371 US 4; *Kaskel v Impellitteri,* 306 NY 73, 86-87 [1953].)

Similar economic concerns motivated the Legislature to permit "negotiated sales" of urban renewal property when it revised the law in 1961, where previously only competitive disposition procedures had been authorized. Several communities upstate had urged this change to help accelerate urban renewal programs.[3] The Legislature agreed that permitting negotiated sales of urban renewal property would "encourage redevelopment * * * in accordance with the overall needs and requirements of the community as a whole, and will permit the most desirable land re-use rather than the maximum price bid to be the determinant *[sic]* factor in land disposition." (1961 NY Legis Ann, at 235.)

Article 15 also contained a saving provision for "[a]ny urban renewal program commenced or undertaken prior to the effective date" of the new law (General Municipal Law § 523 [1]). Municipalities were given the option of completing programs begun before mid-April 1961 pursuant to either the old urban renewal law or article 15 which, as noted, allows for negotiated sales of urban renewal property to qualified and eligible sponsors without competitive bidding (General Municipal Law § 507 [2] [d]).

Following construction of the Jacob K. Javits Convention Center on the west side of Manhattan in the early 1980's, city officials concluded that the Coliseum's exhibition and convention facilities were obsolete. The City contends that, in order to prevent a recurrence of the "substandard and insanitary" conditions which the original project had remedied, it was necessary to amend so much of the original Columbus Circle plan as pertained to the Coliseum "to permit the site to be devoted to other uses".

### THE CURRENT CONTROVERSY

The original Slum Clearance Plan for Columbus Circle specifically provided that, for a period of 40 years, there could be no increase in density or change of land use within the urban renewal area except upon approval by the City's Board of Estimate. The agreement between the City and TBTA dated

---

3. The City, in a letter dated March 21, 1961 to the legislative committee, advised that while it supported the negotiated sale provision, it "plans to continue to use its present [competitive bid] procedures."

January 15, 1953 and the deeds conveying the use and occupancy to the TBTA incorporate the 40-year limiting conditions regarding land use and density of the site. Covenants running with the land have also barred the TBTA from making any changes in the project, as set forth in the redevelopment plan of the area, without the consent of the City Planning Commission and the Board of Estimate.

Although the redevelopment plan could have been amended, pursuant to section 197-c of the New York City Charter, to permit other uses or increase the allowable density, the City and the TBTA agreed, in December 1984, to sell the Coliseum site for redevelopment and to share the proceeds equally. The TBTA was to spend its share solely for capital projects of its affiliate the Metropolitan Transit Authority (the MTA). Originally, the City's share was to be devoted solely to capital projects for the New York City Transit Authority (the NYCTA). *(See, Matter of Municipal Art Socy. v City of New York,* 137 Misc 2d 832, 834 [Sup Ct, NY County 1987].) However, the City was authorized under the memorandum of agreement to apply its share immediately to any "general City purpose" and to repay the sum plus interest from the City's capital budget over five consecutive years.

Instead of offering the property at auction, the City and the TBTA, as joint sponsors, issued a request for proposals (RFP) for the purchase and redevelopment of the site. Although the RFP states that the site would be sold to the applicant whose proposal met the sponsors' goal "of realizing the highest financial return from the sale", appellant contends that this was not done.

Respondent Boston Properties' offer of $455 million was $22 million less than the highest of the 15 offers received from prospective developers. However, city officials determined that the Boston Properties' proposal would generate greater tax revenue and more jobs over the next decade than the other proposals. These long range economic benefits were deemed to justify acceptance of Boston Properties' bid. Nevertheless the City agreed to increase its capital contribution to the MTA by $22 million, "representing the difference between the price offered by Boston Properties and the highest proposed purchase price."

Although appellant questions the City's determination regarding the long-range benefits of the deal proposed by Boston Properties (particularly since Phibro-Salomon, Inc., which was

to have been the prime tenant, has withdrawn from the project), the complaint does not allege that the transaction was tainted by fraud or corruption. However, allegations that the City has failed to comply with the Charter's mandate and plans to dispose of city-owned realty for less than the highest marketable price, if proven, would establish both an illegal official act and a waste of public property. The complaint therefore states a valid claim under General Municipal Law § 51 as elaborated recently in *Matter of Korn v Gulotta* (72 NY2d 363, 371-372 [1988]), *Mesivta of Forest Hills Inst. v City of New York* (58 NY2d 1014 [1983]), *Starburst Realty Corp. v City of New York* (125 AD2d 148, 154-155 [1st Dept 1987], *lv denied* 70 NY2d 605) and in *Kaskel v Impellitteri (supra,* 306 NY, at 79), a taxpayer's action which challenged the original Columbus Circle slum clearance plan pursuant to which the City acquired the property on which the Coliseum now stands.

In *Kaskel v Impellitteri (supra),* the Court of Appeals upheld the powers of eminent domain conferred upon municipalities under General Municipal Law former § 72-k. The taxpayer's claim that the Columbus Circle project was illegal because most of the property in the area was not in fact substandard or insanitary, was rejected, by a divided court, as nonjusticiable. The power to designate large areas as "appropriate for urban renewal" and to take, by condemnation, all of the real property found therein (including land and buildings which were neither substandard nor insanitary) was held to have been "lodged by the Constitution (N.Y. Const., XVIII, § 1) and the statute (General Municipal Law, § 72-k) in the city planning commission and the board of estimate" *(supra,* 306 NY, at 78).

The majority in *Kaskel (supra,* at 78) found ample evidence in the record to support the City Planning Commission's determination that "a substantial part of the area" was substandard and insanitary and that "the whole 6.32 acres, taken together, may reasonably be considered a single 'area' for clearance and redevelopment purposes." In a rather prophetic paragraph, however, the majority opinion notes: "It is not necessary, nor would it be useful, for us to measure the full possible reach of section 1 of article XVIII of the State Constitution, or section 72-k of the General Municipal Law. It is not to be assumed that responsible public officers will, in some future instance, label as 'substandard or insanitary' an area in which there are no buildings at all, or fine, modern buildings only, or that they will attempt to condemn a num-

ber of such buildings by stretching the concept of 'area'. Such attempts can be dealt with if and when they are made." *(Supra,* 306 NY, at 81.) In the instant appeal, appellant asserts that the City has labeled prime real estate "substandard" without any factual basis therefor and is attempting to resuscitate an urban renewal project which was long ago successfully completed in order to evade the Charter's competitive bidding requirement.

Respondents, however, contend, and Supreme Court agreed, that the 40-year limiting provisions in the original Slum Clearance Plan, the agreement between the City and the TBTA, and the two deeds conveying the use and occupancy of the site, establish that the original plan did not end upon completion of the project but continues until 1996. Consequently, it is maintained, the revised Urban Renewal Law is applicable until completion of what Supreme Court deemed to be an ongoing urban renewal program. The City, therefore, had a specifically sanctioned alternative in General Municipal Law § 507 (2) (d) to the Charter's competitive bidding requirement when it sold its interest in this urban renewal property.

Alternatively, respondents argue that the site on which the Coliseum stands was "acquired by the city at the expense of" the TBTA, in consideration of which the TBTA received the rights of use and occupancy for the site. Consequently, the TBTA was empowered under Public Authorities Law § 553 (4-a) (b) to sell or lease the property in the City's behalf without competitive bidding.

### THE PUBLIC AUTHORITIES LAW

Section 553 (4-a) of the Public Authorities Law gives the TBTA power:

"Whenever any real property is determined by the authority to be unnecessary for its corporate purpose.

"(a) to surrender such real property to the board of estimate of the city for other public use or purpose of such city, or

"(b) to sell and convey or lease in behalf of such city any real property acquired by the city at the expense of the authority."

While the Public Authorities Law permits conveyance of the use and occupancy of any city-owned land to the TBTA, with or without consideration therefor (Public Authorities Law § 557-a [3]), only real property "acquired by the city at the

expense of" the TBTA may be sold by the authority pursuant to § 553 (4-a) (b). If, however, the real property or the City's interest therein was *not* acquired at TBTA expense, then the authority must, under section 553 (4-a) (a), surrender such property (or the TBTA's interest therein) to the Board of Estimate. Thus, the question raised by the statute is whether the Coliseum site, or the City's interest therein, was acquired at TBTA expense. Given the record before us, this question must be answered in the negative.

Supreme Court, quite rightly, rejected respondents' contention that the City has no ownership interest in the site. It found that the City has both legal title and a reversionary interest in the property. As evidence of this, the court noted that "the city is contractually one of the sellers, expects to receive a substantial portion of the proceeds, and has retained substantial control over the entire sale process" *(Jo & Wo Realty Corp. v City of New York,* 140 Misc 2d 154, 158 [Sup Ct, NY County 1989]).

Although Supreme Court considered the nature of the respective interests of the City and the TBTA in the site, the court did not reach the issue of whether this property could be disposed of by the TBTA pursuant to section 553 (4-a) (b). The issue, however, is readily disposed of by examination of the transaction, consummated in 1953, in which these parties obtained their interests in the property. The contemporaneous documents do not support respondents' contention that the site or the City's interest therein was "acquired by the city at the expense of" the TBTA.

The agreement between the City and the TBTA, dated January 15, 1953, recites that "the City shall institute all necessary proceedings *to acquire by condemnation* all of the real property" in the project area (emphasis added). Section 101 of the agreement further provides: "In consideration of the sum of $2,182,230.00 paid by the Authority to the City, the City, promptly after acquisition of title in said condemnation proceedings, shall convey to the Authority for the 'Coliseum' to be constructed by the Authority the use and occupancy [of the area] for so long as the corporate existence of the Authority shall continue". The cost of acquiring the land for the entire Columbus Circle project was $12.1 million of which $6 million was financed by a Federal grant and $3 million by local grants-in-aid, according to the affidavit of the former TBTA counsel Frederick S. Harris and the title I certificate of completion filed with the Federal Government. Thus, the

TBTA's payment of $2.2 million represented only one sixth, little more than 16%, of the total cost paid by the City to acquire the urban renewal property. The record is silent regarding the portion of the $12.1 million attributable to the Coliseum site. However, as Judge Van Voorhis pointed out in his vigorous dissent in *Kaskel v Impellitteri,* the undisputed facts established that the more valuable property lay in the vicinity of Columbus Circle where the Coliseum was to be built and that the less costly "slum" property lay in the western portion of the area where the residential redevelopment was to occur *(supra,* 306 NY, at 82-88).

In view of these facts, I conclude that the TBTA funds were given, not to enable the City to acquire title to the site, which the City acquired through condemnation proceedings primarily with Federal and local government funds, but in consideration for the rights of use and occupancy of the site. This conclusion finds additional support in the language of the deed dated November 17, 1953, in which the City conveyed these rights to the TBTA.[4]

The fact that the City contracted to convey the use and occupancy to the TBTA for $2.2 million prior to its acquisition of the site, has no bearing on the issue of whether the City's interest in the property was acquired at TBTA expense. While payment by the TBTA of the full acquisition cost may not be required under section 553 (4-a) (b), payment of a mere 16% of the acquisition cost cannot possibly be deemed to satisfy the statutory requirement. The record, therefore, does not support respondents' claim that this property was acquired by the City "at the expense of the authority" and thus could be sold by the TBTA under Public Authorities Law § 553 (4-a) (b).

THE URBAN RENEWAL LAW

Turning to respondents' primary argument—that the site is part of a continuing urban renewal "plan or program" commenced prior to April 1961, and as such, under the revised Urban Renewal Law, could be sold without competitive bidding—I find it to be equally unsupported. While respondents

---

4. The conveyance of the deed reads as follows: "NOW, THEREFORE, WITNESSETH: That the [City], in consideration of the sum of Two Million, One Hundred Eighty-Two Thousand, Two Hundred Thirty Dollars ($2,182,230.) lawful money of the United States, paid by the [TBTA], does hereby convey unto the [TBTA] the use and occupancy for so long as the corporate existence of the [TBTA] shall continue".

do not deny that "the Coliseum *project* was completed in 1956", they maintain that "the urban renewal *plan or program* is not complete" (original emphasis) by virtue of the 40-year limiting condition contained in the Slum Clearance Plan, the agreement and deeds. Their argument, however, is defeated by the plain words of the saving provision in the statute.

The saving clause of article 15 declares that a municipality may exercise the "rights and powers" of the revised Urban Renewal Law only *"until the completion of such program."* (General Municipal Law § 523 [1] [emphasis added].) Neither the term "project", "program", or "plan" is defined under former section 72-k which essentially relied on the Federal regulations and procedures governing title I loans. The Federal procedural framework was incorporated in the State Urban Renewal Law when article 15 was enacted (42 USC § 1455; General Municipal Law § 505 [4]).

The definitional section of article 15 (as originally enacted and as found today) defines "urban renewal" as: "A program established, conducted and planned by a municipality for the redevelopment, through clearance, replanning, reconstruction, rehabilitation, and concentrated code enforcement, or a combination of these and other methods, of substandard and insanitary areas of such municipalities * * * *including those programs authorized by and to effectuate the purposes of title one of the housing act of nineteen hundred forty-nine".* (General Municipal Law § 502 [3] [emphasis added].) Section 502 (3) further states that the term *program* "may mean or include and be interchangeable with the term *'project.'* "

Urban renewal "plan", however, is a separately defined term which is not interchangeable with the terms project or program (General Municipal Law § 502 [7]). An urban renewal "plan" is the over-all guide for the project or program within a designated urban renewal area, or part thereof (General Municipal Law § 502 [7]; § 505). It describes the "proposed methods or techniques of urban renewal" and "proposed program of code enforcement" to remedy the blighted conditions which make the project or program necessary in the first instance (General Municipal Law § 502 [7]).

It must be remembered that the original Columbus Circle project was one "authorized by and to effectuate the purposes of" title I of the Housing Act. A title I "project", as defined in 42 USC § 1460 (c) (1949), included only actions undertaken by

the municipality prior to sale or transfer of the urban renewal property to a private developer. These governmental actions included: site acquisition, demolition, site preparation and marketing of the urban renewal property.

Although an important goal of the title I programs was to provide "maximum opportunity for the redevelopment of project areas by private enterprise" (42 USC § 1452 [former (a)] [1949]), the Federal loans thereunder were only available to municipal governing bodies to subsidize activities in blighted areas which were uneconomic and therefore required special governmental intervention (see, 42 USC § 1452 [1949]). The Act required a finding by the governing body of the municipality—here, the Board of Estimate—that the financial aid to be provided was "necessary to enable the land in the project area to be redeveloped in accordance with the redevelopment plan". (42 USC § 1455 [former (a)] [1949].) Contracts for title I aid also obligated the municipality to require that purchasers or lessees of urban renewal property "devote such land to the uses specified in the redevelopment plan for the project area" (42 USC § 1455 [former (b)] [1949]).[5] Construction costs for redevelopment of the site by private developers were specifically excluded (42 USC § 1460 [former (c)] [1949]).

Title I subsidies were also specifically reserved for clearance of predominantly residential areas which were to be redeveloped for predominantly residential use. (42 USC § 1460 [former (c)].) The original Columbus Circle project only met this Federal requirement because 18,000 square feet of parking space in the Coliseum was to be set aside for residential use, "otherwise less than 50% [of the project space] would be devoted to residential purposes" (Kaskel v Impellitteri, supra, 306 NY, at 95). However, a subsequent amendment to the Columbus Circle plan eliminated the residential use restriction on the 18,000 square feet of parking space.

Respondents point to this first amendment of the plan as evidence that the Columbus Circle project did not expire once the Coliseum had been built. However, the fact that the plan was revised to permit nonresidential use of the parking space (in conformity with later Federal standards) after the project was completed,[6] however, does not mean that the title I

---

5. These conditions and other requirements for title I aid which did not originally appear in section 72-k of the State law, became part of the revised Urban Renewal Law.

6. The Board of Estimate resolution of August 30, 1956, approving this

project or program was revived by this minor land use change in the plan.

Appellant observes that the 40-year use and density restrictions such as those found in the original Columbus Circle plan, the agreement with the TBTA and the deeds, were standard contractual provisions for title I projects and were tied to the 40-year repayment limit for title I loans (42 USC § 1452 [former (a)] [1949]; see, Matter of Park W. Vil. Assocs. v Abrams, 127 Misc 2d 372, supra). Their purpose was to insure that repayment of borrowed money would not be jeopardized and not to confer, arbitrarily, a 40-year life upon urban renewal projects. To argue, as do respondents, that the 40-year contractual restrictions imposed upon the developer of the title I project should be read to confer upon the municipality rights in derogation of its powers under the City Charter for decades following eradication of the blighted conditions, is farfetched.

As already noted, a title I project, by statutory definition, only included those urban renewal activities undertaken by a municipality up to the point at which the property was transferred to a private developer. Both title I and article 15 clearly contemplate survival of the urban renewal plan after transfer of the property (i.e., after completion of the municipality's active involvement requiring exercise of its special powers of eminent domain and negotiated disposition of the urban renewal property). The developer's obligation to redevelop and maintain the site in accordance with the urban renewal plan is thereafter monitored and enforced by the municipality.

The ordinary police and zoning powers of the municipality are entirely sufficient to monitor and enforce compliance by the developer with the urban renewal plan, or to amend it should subsequent events in the area so require after completion of the title I project or program (see, NY City Charter § 197-c). The Legislature, however, recognized in the revised

---

first amendment to the plan, recites that the Coliseum was "now constructed". "Completion of the project", however, is defined in section 304 of the agreement as the date on which certificates of occupancy for the Coliseum buildings were issued by the City's Department of Housing and Buildings. There is no evidence in the record indicating when in 1956 the certificates of occupancy were issued. Even if it is uncertain when this title I project was "completed" according to the contractual definition, under the statutory definition it was complete upon transfer of the urban renewal site to the developers.

Urban Renewal Law that in order to successfully complete a title I project additional rights and powers—such as the power to make negotiated dispositions of urban renewal property— might have to be exercised by the municipality. *(See, e.g.,* General Municipal Law § 506 [former (2)]; § 507 [former (2)] [1961].) Recourse to these powers is only justified if their exercise is rationally related to the statutory purposes. A finding that current conditions warrant exercise of these powers is therefore mandated before designation of the urban renewal area (General Municipal Law § 504).

Respondents would have us read the term "plan" as synonymous or interchangeable with "project" or "program". This reading, however, is contrary to both the letter and intent of the law. The issue is not whether the urban renewal plan for Columbus Circle is still extant—which, concededly, it is—but whether the original title I *project or program* has been completed. The record herein leaves no doubt that it has. As defined by statute, this title I project was completed upon transfer of the residential parcel to the private developer and the Coliseum parcel to the TBTA. As contractually defined in the City's agreement with the TBTA, the original project "was completed in 1956" as the second amended plan calling for redevelopment of the Coliseum site states on page 5.

Successful completion of the title I project necessarily implies that the "substandard and insanitary" conditions previously found in the area have been eliminated—at the earliest, upon clearance and transfer of the site; at the latest, upon issuance of the certificates of occupancy for the Coliseum buildings in 1956. Consequently, when article 15 was enacted five years after completion of the original project, there were no conditions in the area warranting recourse to the rights and powers conferred by either the old or the new Urban Renewal Law.

Finally, respondents argue that even if the original project was not viable under the saving clause of section 523, the City has nevertheless redesignated the Coliseum site for urban renewal pursuant to article 15 and may, therefore, dispose of it without competitive bidding. Here again, the record does not support respondents' claim to summary judgment on this ground.

Article 15 calls for designation of an urban renewal site "upon a finding that such area is appropriate for urban renewal as defined in subdivision three of section five hundred

two of this article." (General Municipal Law § 504.) Essentially, what is required is a finding that the area is "substandard and insanitary" and therefore a "blighted" area. As the case law makes plain, these terms are to be given liberal rather than literal definition and may encompass areas which are "in the process of deterioration or threatened with it as well as ones already rendered useless, prevention being an important [statutory] purpose." *(Yonkers Community Dev. Agency v Morris,* 37 NY2d 478, 483 [1975]; *Kaskel v Impellitteri, supra,* 306 NY, at 79-80.)

Thus, there is no disagreement with respondents' claim that an area threatened with economic stagnation due to improper land use, outmoded or deteriorated structures, is an appropriate subject for urban renewal. However, as appellant points out, the City has produced no facts in support of its determination that the Coliseum site—a prime area in midtown Manhattan bordering on Central Park—is threatened with economic stagnation because existing or imminent conditions "discourage builders and investors from developing the area" (L 1961, ch 402, § 1 [3]). This is a key consideration in deciding whether the area is appropriate for urban renewal, inasmuch as the exercise of special urban renewal powers (here, the disposition of urban renewal property through negotiated sale) must be reasonably related to the remedial aims of article 15.

Apart from respondents' assertion that the Coliseum *building* is obsolete, there is nothing to support a determination that a negotiated sale of the City's interest in the Coliseum *site* is necessary to permit it to be devoted to other uses or to prevent deterioration of the area. No real estate surveys, economic projections or other relevant data are found in the record herein which would support a finding that the Coliseum site is unattractive to investors or currently threatened by any type of deterioration.

The second amended plan prepared by the City's Department of Housing Preservation and Development plainly relied on the 1952 site designation. This plan does not recommend redesignation of the Coliseum site and it contains no evidence that, in the intervening 35 years, conditions in the area have so deteriorated that governmental intervention through a new urban renewal program is required. It was approved on December 10, 1986 (calendar No. 861071 HUM) by the City Planning Commission, which must review urban renewal plans "[f]ollowing the designation of an area" as appropriate for urban renewal (General Municipal Law § 505 [1], [2]; NY

City Charter § 197-c [a] [8]). No official redesignation of the site preceded approval of the second amended plan.

The City's contention that it is entitled to rely on the Board of Estimate's 1952 finding that the area was substandard and insanitary must be dismissed outright. Whatever conditions justified designation of the entire two block urban renewal area were remedied by the original project which the City concedes was completed in 1956. Moreover, the second amended plan calls for no changes in the urban renewal area for the residential parcel near Ninth Avenue. It addresses only the Coliseum parcel which, even in 1952, could only be considered substandard by virtue of its being subsumed in the larger area that included the "slum" property near Ninth Avenue.

The City Planning Commission made no independent findings as to whether current conditions in and around the Coliseum make this site appropriate for redesignation as a substandard or blighted area when it approved the second amended plan. The Commission's certification that the second amended plan "complies with the provisions of § 502, Article 15" therefore appears, upon this record, to lack any basis in actual fact or current conditions. The Board of Estimate resolution adopting the second amended plan, which incorporates the Planning Commission's findings and certification, therefore, also lacks evidentiary foundation insofar as any determination regarding new site designation may be inferred therefrom.

While the finding by the municipality that the exercise of the power of eminent domain will serve a legitimate public purpose is "not a question of fact for de novo determination" by the courts, the taking must be " 'rationally related to a conceivable public purpose' " and an adequate factual basis therefor must be shown (*Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 425 [1986], citing *Kaskel v Impellitteri, supra,* 306 NY, at 79; *see also, Rosenthal & Rosenthal v New York State Urban Dev. Corp.,* 771 F2d 44 [2d Cir 1985], *cert denied* 475 US 1018; *In re G. & A. Books,* 770 F2d 288, 297 [2d Cir 1985], *cert denied sub nom. M.J.M. Exhibitors v Stern,* 475 US 1015). Even though judicial review of the municipality's determination that an area is "substandard" and qualifies for urban renewal, is extremely limited *(Kaskel v Impellitteri, supra)* and the legislative findings on the subject are entitled to great weight *(Denihan Enters. v O'Dwyer,* 302 NY 451, 457 [1951]), the facts relied upon by the

municipality must be spread upon the record, for the determination that there is a public purpose to be served by recourse to the Urban Renewal Law "must be made by the courts themselves and they must have a basis on which to do so" *(Yonkers Community Dev. Agency v Morris, supra,* 37 NY2d, at 485).

The City, like the municipal agency[7] in *Yonkers Community Dev. Agency v Morris (supra,* at 485), has failed to indicate "in any manner the grounds upon which it concluded that the land is presently substandard." The Court of Appeals, in distinguishing the *Yonkers* case from *Kaskel v Impellitteri (supra),* noted that in *Kaskel* ample evidence, including photographs and data regarding the condemned area, was found in the record supporting the determination made by the City Planning Commission and the Board of Estimate. The dispute in *Kaskel,* arose from the conclusion to be derived from the facts of record. Here, however, no factual basis has been presented in support of the determination by either the City Planning Commission or the Board of Estimate. Unlike the plaintiffs in the *Yonkers* case who did not raise the issue in their pleadings, appellant herein clearly and emphatically points to the absence of any factual record supporting the current designation of the site as appropriate for urban renewal.

Inasmuch as "courts are required to be more than rubber stamps in the determination of the existence of substandard conditions" which would justify recourse to the rights and powers under the Urban Renewal Law *(supra,* 37 NY2d, at 485), the record herein is manifestly inadequate to allow independent judicial consideration of this issue. Respondents, therefore, have not shown their entitlement to summary judgment as a matter of law and the order appealed from should be reversed.

KUPFERMAN and CARRO, JJ., concur with SULLIVAN, J.; MURPHY, P. J., and ROSENBERGER, J., dissent in an opinion by ROSENBERGER, J.

Resettled order, Supreme Court, New York County, entered on or about August 29, 1988, affirmed, without costs and without disbursements.

---

7. Article 15 authorizes a municipal governing body to establish an urban renewal agency to recommend site designations and to prepare plans for designated areas (General Municipal Law § 502 [5]; §§ 504, 505 [1]).