OPINION OF THE COURT
Martin Evans, J.
Petitioner is the sponsor of a noneviction condominium conversion plan for two apartment buildings, 372 and 382 Central Park West, part of the Park West Village housing development on Manhattan’s Upper West Side. The Attorney-General has refused to accept the conversion plans for filing. Petitioner seeks an order annulling the determination of the Attorney-General and compelling him to accept the plans for filing. The Attorney-General opposes the petition and cross-moves to dismiss.
The Attorney-General based his determination on a belief that prior Board of Estimate approval, not sought by the sponsor was a prerequisite to the conversion. An agreement between the original owner of the land and the City of New York provided that there were to be no changes in land use or density for a period of 40 years from the completion date, without the consent *373 of the Board of Estimate and of the City Planning Commission of the City of New York.[1]
Claiming that this change of ownership, from tenant-occupied apartments to apartments owned by the occupants (at least as to those persons who may buy their apartments) was a change prohibited by the original agreement, the Attorney-General refused to accept the plan unless and until there has been a consent by the Board of Estimate, and a modification of the plan to set forth that requirement as a material statement that had been omitted from the original plan.
In addition, the Attorney-General attempted to reserve his rights to deny acceptance for filing on other, unspecified grounds, stating that the plan had not been fully reviewed for other deficiencies.
For proper analysis of this case, a brief history of the buildings and of the agreement involved is desirable.
*374 The two buildings are a part of a group of buildings that were constructed in the 1950’s as part of a redevelopment plan in the area known as the Manhattantown Redevelopment Site, comprising the blocks between West 97th and West 100th Streets, between Central Park West and Amsterdam Avenue.
The City of New York, taking advantage of the provisions of Housing Act of 1949 title I (42 USC § 1441 et seq.), and borrowing and obtaining some moneys from the Federal Government under title I, acquired title to the entire area and sold the land, at a public auction, to Manhattantown, Inc. Manhattantown paid a fair market price for the land. Schedule B, annexed to the agreement, sets forth the conditions of the sale upon which the public auction was based.
Pertinent here are the statements in the condition of sale that the property was to be sold subject, among other things, to the terms and provisions of the contract between the city and the Federal Government, and the terms, covenants and conditions of the contract with the city. This contract was described in general terms, stating the obligation of the successful bidder to relocate the existing tenants, to demolish the buildings, and to construct one or more housing projects on the property in accordance with a site and layout plan approved by the City Planning Commission, the Board of Estimate and the Federal Administrator of the Housing and Home Finance Agency. It described the projects as a park-like development, landscaped and improved with fireproof multiple dwellings, as was shown on the redevelopment plan attached as schedule A to the contract on file.
*375 The purpose of title I was to enable communities to restore needed housing, but it did not concern itself with the type of housing, or with the nature of the occupancy. In some areas, private homes could be rehabilitated; in others, apartment houses. Neither was it concerned with the question of whether the dwellings were to be occupied by tenants or by their owners.
I
THE CONTRACT BETWEEN MANHATTANTOWN AND THE CITY
Manhattantown entered into a contract with the City of New York on May 22, 1952, wherein it agreed, in the event that it became the successful bidder at the auction of the land, to relocate the then existing tenants, and to demolish the then existing buildings.
Paragraph 302 of the agreement states that “The project shall consist of fireproof multiple dwellings, together with such business, commercial and garage facilities as are deemed reasonably incident thereto, and as shown on the Redevelopment Plan attached hereto, as Schedule ‘A’ ”.
Paragraph 401 of the agreement required Manhattantown to commence relocation and demolition activities, and “to devote the land to the uses specified in the Redevelopment Plan, Schedule £A’ ”.
No financial benefits or tax abatements were given to Manhattantown by the city or by the Federal Government. Nevertheless, to prevent “speculation” by Manhattantown, and the possibility of the reaping of improper profits as the result of the condemnation and the sale at auction of the land, the contract provided, in paragraph 405 (referred to in paragraph 506 as “the anti-speculation provisions”) that “The sponsor covenants and agrees not to resell the real property in the area prior to the actual completion of the projects at a price in excess of the actual cost to the sponsor of the property including carrying charges and the costs of any improvements thereon * * * without the approval of the Board of Estimate”.
It was not prevented from making a profit at a later date. This of course was the incentive to enter into the contract.
*376 Central to the questions on this petition are the terms in section 509 of the agreement. This provided that there was to be a covenant, running with the land, which was to provide that any grantee “shall devote such land to the uses specified in the Redevelopment Plan of the Area (Schedule A of this Agreement) as said plan may exist from timé to time. Said covenant is to run for a period of forty (40) years from the completion of the project” (emphasis added) and a further covenant that “for the period of forty (40) years from the completion of the project no change shall be made in the project as set forth in the Redevelopment Plan of the Area (Schedule A of this Agreement) without the consent of the City Planning Commission and the Board of Estimate of the City”.
Paragraph 510 of the agreement provided, in effect, that there were to be no third-party beneficiaries of the agreement.
In support of his proposed interpretation of the contract, the respondent Attorney-General relies on nine separate references (which are set forth in his rejection letter of June 10,1983) to the redevelopment plan attached to the contract as exhibit A.
Of these nine references, four (the first two and the last two) are not a part of exhibit A which was attached to the contract. The first (referred to as p 3, col 2, fourth full paragraph but apparently intended to mean p 2, rather than p 3); and the second (referred to as p 4, line 4 but intended to mean p 3, line 4) were references to a report to the Mayor and the Board of Estimate by the Committee on Slum Clearance Plans and were not, so far as can be determined from the papers before this court, a part of exhibit A.
The last two references, both on page 51, are apparently references to an appraisal letter from an officer of Charles F. Noyes Co., in which he was to determine: (a) the suitability of the area for housing; (b) the economic feasibility of the proposed project; and (c) the price that could be realized by the City of New York, if offered at public auction after acquisition by condemnation.
The appraiser’s conclusions were based on many factors. Among them was his statement that he used minimum rental value as a basis for calculations of the capitalized value of the projected development. In any event, this appraisal was not a part of the exhibit A annexed to the agreement.
Turning to the remaining five references in the redevelopment plan, exhibit A (three on p 14, one on p 15 and one on p 20), it is apparent that these do not support the proposition that exhibit A contained a restriction on the type of ownership of the buildings or as to the type of ownership or occupancy of the apartments. Pages 14 and 15 of the redevelopment plan are *377 primarily concerned with the floor layout of the apartments, and with permitting flexibility (e.g., the possibility of converting two five-room apartments to one six-room and one four-room apartment). It is contextually clear that the use of the terms “rental” or “rental basis” or “rental rooms” referred, essentially, to the concept that in all probability, income to sustain the operation of the buildings would come from rentals. In short, the conclusion, and argument of the respondent is based on the few instances, in the redevelopment plan, wherein rents, and rental units, are referred to.
These do not even rise to the level of precatory statements. Essentially, they are used as the basis for concluding that the cost of the land, at public auction, was a fair value, based on the rents that could be received; and that the project would be financially feasible to a private building, assuring that a private builder would be able to build and operate it profitably.
This was an important consideration, since the building was to be financed by a mortgage which was to be held, or guaranteed by the Federal Government. It was necessary to be as certain as possible that the moneys lent could be repaid over a period of time.
It is interesting that the maximum period of time for the repayment of the mortgage was set by statute at 40 years (42 USC § 1452 [a]), the same time period during which there could be, by virtue of the agreement, no changes in the project. It appears that provision may well have been for the purpose of insuring the repayment of the borrowed moneys.
More important to the determination of the meaning of the word “change” in paragraph 509 of the contract, is that part of exhibit A, under “GENERAL STATEMENT” which appears in the page following 32 (one of many pages showing the general layout of the proposed buildings) where there is, in typewritten form, the following:
“6. The following is the general statement on the project, dated February 1, 1952.
“A. Limitations on changes:
“No increase in density or change in land use shall be made for a period of 40 years except upon the approval of the Board of Estimate of the City of New York.”
Since the only reference to “change” in the contract is found in section 509, and since the wording of that section is “no change shall be made in the project as set forth in the Redevelopment Plan of the Area (Schedule A of this Agreement) without the consent of the City Planning Commission and the Board of Estimate of the City” it seems clear that the “change” referred to in the agreement is the type of change set forth under general *378 statement No. 6, which limits the changes in the project requiring approval to increases in density or changes in land use.
Had it been the intent of the contracting parties, i.e., the City of New York and the sponsor, Manhattantown, to limit the occupancy of the apartments solely to rental tenants, who had no share of ownership of the property, that could have been done by and undoubtedly would have been done, with easily inserted language. To attempt to construe such an important limitation from the few instances in which the words “rental” or “tenants” occur, especially in an entirely different context, is stretching the meaning of the contract far beyond its facial and contextual intent.[2]
To carry respondents’ argument to its logical conclusion, the court would be required to impose other utterly illogical and unintended constructions. Since the redevelopment plan referred, in some cases, to “Estimated Rental Value” at $30.50 per room per month (see p 20 of the 1952 plan), rental of stores at 50 cents per foot per month, and rental of parking space for 464 cars at $120 per car per year (id.) the court would be compelled to conclude that these rates and charges could not be changed without permission of the Board of Estimate. Respondent’s argument, based on the redevelopment plan, would limit the taxes that could be imposed on the premises to those which are set forth (at p 20) of only $900,000 per year. There is no evidence that the City of New York and Manhattantown intended to prevent the city from increasing the tax rate or the assessed valuation to keep the taxes at that low (in present terms) figure, or to require Board approval for every such change. Indeed, the history of the project’s management over the last three decades belies such an intent.
Moreover, if the selective figures and quotes taken by the respondent from the redevelopment plan are to be given such *379 weight as to amount to a binding term of the contract, it would lead to an absurd conclusion. Because the redevelopment plan indicated that those buildings would not be subject to any form of rent control one might be compelled to conclude that the city was contractually prevented from imposing rent controls of any nature on these buildings. It should be kept in mind, in determining the intent of the parties at the time of the agreement, that these buildings were then envisioned as and in fact were, after their construction, entirely free of all rent controls or other forms of rent limitations. Tenants then had no rights beyond the rights given by their leases. Nothing then existed to prevent any owner of post World War II constructed housing from refusing to renew the lease of a tenant, or from evicting a tenant at the termination of the lease, and disposing of the property as it desired.
Significant, also, to show the intent of the parties, is the provision in section 508 of the agreement. Clearly stated is the right of the sponsor, Manhattantown, to construct any of the buildings as a cooperative project, under National Housing Act § 213. (See, National Housing Act tit II [12 USC § 1701 et seq.; § 1715e].)
The National Housing Acts are essentially financing acts. Section 213 authorized the Federal Housing Commissioner (now, the Secretary of Housing and Urban Development), to insure mortgages. The purpose of this is to enable persons, such as developers and builders, to obtain financing in order to build the desired properties. Section 213 permits such insurance on property held by
“(1) a nonprofit cooperative ownership housing corporation or nonprofit cooperative ownership housing trust, the permanent occupancy of the dwellings of which is restricted to members of such corporation or to beneficiaries of such trust;
“(2) a nonprofit corporation or nonprofit trust organized for the purpose of construction of homes for members of the corporation or for beneficiaries of the trust”. (12 USC § 1715e [a].)
Section 213 was not designed to be limited to low income housing. Mortgages up to a principal amount of $36,000 were permitted on nonelevator type buildings, and for buildings of the type contemplated in the Manhattantown project, containing elevators. Depending on the number of bedrooms, the principal amount of the mortgage insured could be up to $43,758 per family unit. These amounts could be increased in the discretion of the Secretary (see, 12 USC § 1715e [b]) and were equally applicable to apartments or single-family dwellings (12 USC § 1715e [c]).
*380 It is therefore apparent that, even under the original redevelopment plan, occupancy of the proposed buildings was not limited to persons who had no right of ownership, beneficial or otherwise, in the property.
ii
The redevelopment plan relied upon by respondent is no longer in effect. The redevelopment plan in effect in 1952 had been amended in 1955, and the amendment approved by the Board of Estimate at a meeting on July 21, 1955. That was known as the “Amended Redevelopment Plan” and was then incorporated in the contract between the City of New York and Manhattantown, Inc.
It is important to note that the original 1952 redevelopment plan relied upon by the respondent, which was amended in 1955, was once again revised in 1961, and, as revised, was approved by the Board of Estimate on June 25, 1964. Such periodic revision was contemplated in the agreement of May 22, 1952. This is clear from the provisions of section 509, which as set forth above, referred to the redevelopment plan “as said plan may exist from time to time.”
The revised redevelopment plan was the subject of an agreement between the City of New York and Manhattantown, Inc., which was executed on June 26, 1964.
Clearly stated, in paragraph first: A is the substitution for and in place of the redevelopment plan relied upon by respondent, of the revised redevelopment plan, which was, in the words of the amendatory agreement, “substituted for and instead of, respectively, the Amended Redevelopment Plan and the site plans and the unit plans now in effect hereby are declared to have no further force or effect.”
The revised redevelopment plan (1964) contains none of the statements used by respondent as the basis for his conclusion that only rental apartments could be built, and that they must be continued as rental apartments.
The 1964 redevelopment plan states in section 4a:
“The following uses shall be permitted in land use areas, as shown on the Land Use Map, and all other uses shall be excluded.
“1. Residential: Multi-family residential together with appurtenant permitted services recreation areas and parking facilities.”
*381 That the contracting parties considered, and contemplated the ownership of portions of the properties by purchasers, as well as by lessees, is evident from paragraph 4 (h), which is the “Non Discrimination C Clause”, states that “No agreement, lease, conveyance or other instrument shall be executed whereby land in the Project Area is restricted, either by the City or by purchasers, lessees or successors in interest, upon the basis of race, creed or color in the sale, lease or occupancy thereof.”
in
The original project was based on financing availability under Housing Act of 1949, title I (42 USC § 1441 et seq.). The provisions of the act contemplated financing of both rental and privately owned housing. The legislative history of the act demonstrates that the financing under the act was not limited to rental apartments, but included owner-occupied dwellings. Senate Report No. 84 (US Code Cong & Admin News, 1949, vol 2, at 1550) demonstrates that the Senate was concerned solely with the acquisition of land for a residential use, and not with any particular form of ownership. The act itself shows no intention of favoring any particular type of occupancy, whether tenanted or owned. In the different sections, housing is variously referred to as housing, dwellings or homes. It provided (42 USC § 1452b) that loans may be made both to owners and tenants of property for rehabilitation, and included owner-occupied property. (42 USC § 1452b [a] [1] [A], [B].)
The contract in effect between the City of New York and the United States of America, pursuant to which the land was acquired, contained no limitations on the redevelopers of the type sought to be established by respondent; the sole reference to obligations of the redevelopers, is found in section 106 (H) in which the contract states “When Project land is sold or leased by the Local Public Agency, it will obligate the purchasers or lessees, as the case may be, (1) to devote such Project Land to the uses specified in the Project Redevelopment Plan; and (2) to begin and complete the building of the improvements on such Project Land within a reasonable time.”
The uses specified in the redevelopment plan relate only to multifamily occupancy, and, within that definition, there is no limitation to any particular type of occupancy.
In conclusion, it seems clear that the “Changes” requiring prior approval, as specified by the agreement to which both the City of New York and Manhattantown were parties, and which controls the rights and responsibilities of petitioner as a successor to Manhattantown, were the changes set forth in the “GENERAL STATEMENT” following page 32 of the redevelopment plan, wherein condition A provides:
*382 “A. Limitations on changes:
“No increase in density or change in land use shall be made for a period of 40 years except upon approval of the Board of Estimate of the City of New York.”
Since the clear intent of the parties to the agreement was to permit the occupancy of the apartments by owners thereof as well as by tenants, and since the limitation on changes without prior approval was intended to apply only to changes in land use and land density, no approval by the Board of Estimate was needed by the petitioner, the successor to Manhattantown, for the conversion planned in its filing with the Attorney-General.
The petition is accordingly granted, and the cross motion is denied.

. On September 15,1983, the Board of Estimate of the City of New York adopted a resolution, in which it was stated that the intent of the Board of Estimate which adopted the original agreement of 1952 between the City of New York and Manhattantown, was to reserve to the Board of Estimate the right to determine the appropriateness of any change in the redevelopment plan; thereby, intending to include the conversion to a cooperative or condominium form of ownership as such a change.
In effect, this is an expression of the present members of the Board of Estimate of their opinion of the intent of their predecessors on the Board.
It is the court, and not the Legislature, which must determine the intention of the parties to an agreement. Even if the Board were constituted with the same membership as the Board of Estimate in 1952 (and none of the present members were then members) their statement would be of the same effect as if one party to a contract were to declare what its intentions had been at the time of execution. It is hornbook law that such paroi evidence is inadmissible to alter the terms of a facially unambiguous contract.
The law in this respect is well settled. As long ago as 1857, the Court of Appeals, in People ex rel. Mutual Life Ins. Co. v Board of Supervisors (16 NY 424), set forth the applicable rules. The Legislature, on March 24, 1855, enacted a law which declared that mutual insurance companies incorporated prior to the General Act of June 29,1853 (L 1853, ch 469) should be subject to taxation on the sum of $100,000, and no more. The new act (L 1855, ch 83, § 1) also contained the statement that “[I]t is hereby declared that such was the intention, and it is the true construction of said act, of June [29, 1853] in regard to any taxes imposed on said companies after said act took effect.” The court said: “We habitually look with great respect upon all acts of the legislature, and never refuse to give them effect except where, upon the fullest consideration, we find that they conflict with the constitution. The act in question, considered as a persuasive argument for a particular construction of the statute of 1853, loses much * * * weight from the consideration that the legislative bodies had been renewed in the interval between the two enactments, and that but a few of the members of the legislature of 1853 sat in that of 1855; but if this were otherwise, we should feel constrained to rely upon the *374 language of the statute which we are called upon to interpret, rather than any personal assurance as to the intention of its members. The acts of the legislature do not rest in any respect upon oral tradition. They are committed to writing, and it is by the written language that their sense is to be ascertained. As an authoritative mandate in favor of the construction claimed by the insurance company we cannot accord to it any force whatever. In the division of power among the great departments of the government, the duty of expounding written laws has been committed to the judiciary. The legislature has no judicial power, and cannot upon any pretence [whatever] interpose its authority respecting questions of interpretation pending in the courts. (Dash v. Van Kleeck, 7 John., 447; Ogden v. Blackledge, 2 Cranch, 272.)” (Pp 431-432.)
A later statement of prior legislative intent respecting legislation passed by an earlier Legislature, while not conclusive, is entitled to some weight in determining the construction to be given it. (See, Federal Hous. Admin, v Darlington, Inc., 358 US 84, 90.) How much weight should be given it will depend upon a number of factors, including the number of persons who continued as members of the same Legislature. (Matter of Chatlos v McGoldrick, 302 NY 380, 388.)
However, we deal here, not with legislative intent with respect to a statute, which has been passed as a unilateral declaration by the Legislature. Involved here is a contract, which creates vested rights and responsibilities. It is a *375 fundamental principle of contract law that these rights cannot be changed or diminished or increased by unilateral acts of either party. To the extent that the present Board of Estimate has, by resolution, stated what the intent of the predecessor Board was, the court is bound to accord their statement the same weight that would be given to any witness who offered such testimony in a similar case. The court notes that the Board’s resolution could only have been intended as an expression of past intent. Had it attempted to alter the terms of the parties’ prior agreement, it would have amounted to an unconstitutional attempt to impair the obligations of a contract. (See, US Const, art I, § 10; Trustees of Dartmouth Coll. v Woodward, 4 Wheat [17 US] 518.)

. The contract was obviously drawn by the City of New York. It is a well-recognized rule of construction requiring no citation or authority, that, if there is an ambiguity, it is to be construed against the maker of the document. This rule is based on the simple principle of equity that one cannot be permitted to take advantage of a surprise which one has created by oneself. The court finds that the provisions here at issue, when read together, are clear and unambiguous. However, to the extent that the city argues that there is an ambiguity which must be resolved by the court, it should be barred from benefiting from it. In any event, in construing an ambiguity, the court must look to the relevant surrounding circumstances to determine the contracting parties’ intent. Nothing in the record indicates that the parties contemplated the word “changes” to mean anything other than changes in land use or increased density. The substituted form of ownership anticipated here is not, by definition, such a change; the use is to continue to be residential, and the density is not projected as changing.