## Michael CHENKIN and Barbara Chenkin, Plaintiffs,

v.

## 808 COLUMBUS LLC, 775 Columbus LLC, 795 Columbus LLC, 805 Columbus LLC, 801 Amsterdam LLC, and PWV Acquisition LLC, Defendants.

### No. 08 Civ. 01244(DC).

United States District Court,
S.D. New York.

Aug. 5, 2008.

Michael Chenkin, New York, NY, Plaintiffs Pro Se.

Barbara Chenkin, New York, NY, Plaintiffs Pro Se.

Kramer Levin Naftalis & Frankel LLP by Jeffrey L. Braun, Esq., Jonathan Fried, Esq., Jessica J. Glass, Esq., Peggy J. Farber, Esq., New York, NY, for Defendants.

## MEMORANDUM DECISION

CHIN, District Judge.

*Pro se* plaintiffs Michael and Barbara Chenkin are residents of Park West Village ("PWV"), a multi-building apartment complex on the upper west side of Manhattan. They sue to stop construction of new buildings within the complex. PWV was built in the 1950's and 1960's as part of an urban renewal project. Defendants are owners of portions of the site and are developing additional buildings in the complex. They move to dismiss the complaint for lack of subject matter jurisdiction or, alternatively, for failure to state a claim upon which relief may be granted. Plaintiffs cross-move to join New York City as a defendant and for partial summary judgment.

For the reasons that follow, defendants' motion to dismiss is granted, and plaintiffs' cross-motion is denied as moot.

## BACKGROUND

### A. *The Facts*

For purposes of the motion to dismiss, the facts as alleged in the complaint are assumed to be true. I have made a few additions and corrections to plaintiffs' descriptions of historical documents relied on in the complaint, as plaintiffs' descriptions are not completely accurate and the documents speak for themselves.

Plaintiffs find themselves in the midst of new building projects at PWV that will affect their quality of life by depriving them of open views, a park-like setting, and a neighborhood of low density population and restricted commercial development. (Compl.¶¶ 2–8, 138–48). Because PWV was constructed pursuant to Title I of the federal Housing Act of 1949 (the "Housing Act"),[1] New York City was required to safeguard these benefits. (*Id.* ¶¶ 40–49).

---

1. Pub.L. No. 81–171, 63 Stat. 413 (1949), 1949 U.S.C.C.A.N. 408 (codified as amended at 42 U.S.C. §§ 1441–69).

The purpose of Title I was to stimulate housing production in post-war America by providing financial assistance to cities. (*Id.* ¶¶ 10–12). The Housing Act set forth objectives and guidelines regarding labor conditions, financing, resale, and relocation of displaced residents. (*Id.* ¶ 14). It intended to provide an "ultimate solution" for slum neighborhoods and to prevent their recurrence. (*Id.* ¶ 15).

In 1952 the federal government provided capital grants to New York City for a number of projects, including PWV. (*Id.* ¶¶ 19–20, 28). To obtain the grant for PWV, the City submitted a detailed redevelopment plan (the "Redevelopment Plan"), which sought to implement the goals of the Housing Act by specifying a number of restrictions on land use and population density. (*Id.* ¶¶ 40–49). These were stipulated as conditions of the grant in an agreement between the federal government and the City (the "Grant Agreement"). The Grant Agreement bound the City and any private developer or purchaser of the land to comply with the provisions of the Redevelopment Plan. (*Id.* ¶¶ 24–25, 32–33).

Later in 1952 the City acquired the land and sold it to a private developer, Manhattantown, Inc., for clearance and rebuilding in accordance with the Redevelopment Plan. (*Id.* ¶¶ 55–57, 59–60). The City's contract with the developer (the "Manhattantown Agreement") included 40–year restrictive covenants requiring adherence to the land-use and population-density specifications of the Redevelopment Plan (*id.* ¶ 58), and the deed to the land provided that the covenants would run with the land.

PWV has since been broken up and resold to various private entities, and several of the buildings have been converted to condominiums. (*Id.* ¶¶ 63–76). In 2006 defendants filed the first of several building plans with the City. (*Id.* ¶¶ 85–99). The PWV Tenants' Association and individual tenants have attempted to stop construction by lobbying city and community officials and pursuing litigation. (*Id.* ¶¶ 100–33). Construction began around the end of 2006 and now continues on five partially erected high-rise residential and commercial buildings. (Pls.' Mem. of Law in Opp. to Dismissal Mot. 23–24).

### B. *Earlier Litigation Involving PWV*

Two prior lawsuits in state court addressed changes in the makeup of PWV. In the first suit in the 1980's the court held that conversion of two of the buildings from rental apartments to condominiums did not constitute a change in land use within the meaning of the restrictive covenants or in any way offend the pertinent laws and contracts. *See In re Park W. Vill. Assocs. v. Abrams,* 127 Misc.2d 372, 382, 491 N.Y.S.2d 886 (Sup.Ct. N.Y. County 1984), *aff'd,* 104 A.D.2d 741, 480 N.Y.S.2d 798 (1st Dep't 1984), *aff'd,* 65 N.Y.2d 716, 492 N.Y.S.2d 27, 481 N.E.2d 567 (1985).

The second suit, filed in 2006, sought a preliminary injunction against the same construction at issue in the present litigation. The 2006 suit argued that the restrictive covenants on the land had not yet expired but would expire in March 2007. Based on an advisory letter from the City, the owners argued that the covenants had expired in July 2006. The court denied the preliminary injunction motion on the grounds that plaintiffs had failed to prove a likelihood of success on the merits, *Park W. Vill. Tenants' Ass'n v. PWV Acquisition LLC,* No. 603756/2006, 2006 WL 5112844 (Sup.Ct. N.Y. County Dec. 6, 2006), and the parties discontinued the suit

in January 2007 (Braun Decl. Ex. G).[2]

### C. *The Present Litigation*

Plaintiffs commenced this action on February 6, 2008. The essence of plaintiffs' argument[3] is the following: The Housing Act and the Grant Agreement lack any provision or date for termination of the conditions placed on the grant of federal money. (Compl. ¶¶ 16, 21–22). Congress intended the grant as an investment that would benefit the public rather than provide future profit for a private owner. (*Id.* ¶ 14; Pls.' Mem. of Law in Opp. to Dismissal Mot. 4–5, 8–10). The conditions of the grant included the land-use restrictions specified in the Redevelopment Agreement and incorporated into the Grant Agreement. Those restrictions permanently bound the City as well as private owners, and the adoption of restrictive covenants limited to only 40 years in the Manhattantown Agreement was therefore invalid. (Pls.' Mem. of Law in Opp. to Dismissal Mot. 7–8, 11). Plaintiffs thus seek declaratory and injunctive relief.[4]

2. The Braun Declaration is filed in the docket of the present case.

3. A pro se complaint is reviewed under a more lenient standard than that applied to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). Accordingly, the Court interprets plaintiffs' *pro se* pleadings "to raise the strongest arguments that they suggest." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quotation omitted).

4. Plaintiffs assert two additional claims: (1) rent increases are limited by both the "antiwindfall" implications of the federal subsidy and Congress's intent to provide moderately priced housing (Compl. ¶¶ 150, 162–64; Pls.' Mem. of Law in Opp. to Dismissal Mot. 10, 21); and (2) the new construction at PWV implicates the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4331 *et seq.* (Pls.' Mem. of Law in Opp. to Dismissal Mot. 17–19). As to the first argument, neither the Housing Act nor the Grant Agreement provides for any form of rent control; nor is

These motions followed. Plaintiffs support their claims with signed declarations from numerous neighbors and area residents. (Pls.' Not. of Cross Mot. Ex. B).

### DISCUSSION

I address first the jurisdictional prong of the motion to dismiss and then I turn to the argument that plaintiffs have failed to state a claim upon which relief may be granted.

### I. *Subject Matter Jurisdiction*

Defendants argue that the Court lacks subject matter jurisdiction over this action because (a) plaintiffs lack standing and (b) the complaint does not assert a claim "arising under" federal law sufficient to present a federal question within the meaning of 28 U.S.C. § 1331. I discuss the two points in turn. While I conclude that plaintiffs have standing (at least in the constitutional sense), I agree that the complaint fails to allege a federal question.[5]

PWV subject to rent control under state or local law, *see Park W. Vill. Assocs.,* 127 Misc.2d at 379, 491 N.Y.S.2d 886. As to the second argument, the last federal agency action relating to PWV predates the enactment of NEPA. *See Greene County Planning Bd. v. Fed. Power Comm'n,* 455 F.2d 412, 424 (2d Cir.1972). Thus, these arguments fail to state a claim upon which relief may be granted and are dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

5. In considering a motion to dismiss for lack of subject matter jurisdiction, although "no presumptive truthfulness attaches to the complaint's jurisdictional allegations," *Guadagno v. Wallack Ader Levithan Assocs.,* 932 F.Supp. 94, 95 (S.D.N.Y.1996), a court should "constru[e] all ambiguities and draw[ ] all inferences in a plaintiff's favor." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005) (internal quotation marks omitted). "The jurisdictional determination is to be made on the basis of the plaintiff's allegations, not on a decision on the merits."

## A. *Standing*

■ Standing is raised on motions to dismiss pursuant to both Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. *See Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 594 & n. 2 (2d Cir. 1993). Standing is also analyzed both in terms of constitutional—or Article III— standing as well as statutory standing. *See, e.g., Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 84 (2d Cir.2006). Article III standing is a matter of subject matter jurisdiction, for it goes to the existence of a "case or controversy," a prerequisite to Article III jurisdiction. *Id.* at 85; *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 433 F.3d 181, 197–98 (2d Cir.2005). Hence, the proper procedure for a district court presented with a standing motion is to consider Article III standing on a motion to dismiss for lack of subject matter jurisdiction first, before considering the issues of statutory standing that "may be closely related to, if not inextricably entwined with," the merits. *Alliance for Envtl. Renewal,* 436 F.3d at 87–88 & n. 6.

■ Here, defendants' standing argument is essentially a statutory one: they contend that the Chenkins do not have standing under the Housing Act and are not third-party beneficiaries of the Grant Agreement. The Chenkins have Article III standing, because they allege they have "suffered 'some threatened or actual injury resulting from the putatively illegal action.'" *Central States,* 433 F.3d at 198 (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The Chenkins have alleged "personal inju-

ry fairly traceable to the defendant[s'] allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Hence, plaintiffs have standing, in the subject matter jurisdiction sense.

## B. *Federal Question Jurisdiction*

Plaintiffs argue that subject matter jurisdiction exists to determine whether defendants' actions violate the conditions of the Grant Agreement and Congress's intentions in passing the Housing Act. (*Id.* at 20–21). Federal courts have jurisdiction over actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Jurisdiction also exists under § 1331 over actions to enforce contractual rights created by federal statute, *see Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union,* 457 U.S. 15, 22, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982), and actions arising from contracts to which the federal government is a party, *see Up State Fed. Credit Union v. Walker,* 198 F.3d 372, 375 n. 4 (2d Cir.1999).

■ An action does not arise under federal law for jurisdictional purposes, however, simply because it involves a federal statute. As the Supreme Court recently reiterated, "a case arises under federal law within the meaning of § 1331 ... if a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 690, 126 S.Ct. 2121, 165

*Zacharia v. Harbor Island Spa, Inc.,* 684 F.2d 199, 202 (2d Cir.1982). Furthermore, the jurisdictional determination should not include an inquiry into the potential or proba-

ble success of an asserted defense. *See Scherer v. Equitable Life Assurance Soc'y of the U.S.,* 347 F.3d 394, 397 (2d Cir.2003).

L.Ed.2d 131 (2006) (internal quotation marks omitted). While the "vast majority" of cases involving federal question jurisdiction are cases where "federal law creates the cause of action," jurisdiction may also exist where the resolution of a state claim necessarily turns on the construction of federal law. *Merrell Dow Pharms. Inc. v. Thompson,* 478 U.S. 804, 808, 813–14, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) (citations omitted). The "mere presence" of a federal issue does not create federal question jurisdiction over a state cause of action. *Id.* at 813, 106 S.Ct. 3229. Where state law creates the cause of action, the court must ask "whether that cause of action poses a substantial federal question." *D'Alessio v. N.Y. Stock Exch., Inc.,* 258 F.3d 93, 99 (2d Cir.2001) (citation omitted).

I discuss these grounds of jurisdiction separately and in greater detail, first in relation to the Housing Act and second in relation to the Grant Agreement.

### 1. *The Housing Act*

#### a. *Cause of Action*

The Housing Act provides no explicit right of action, although it does contain a waiver of sovereign immunity, providing that the Housing and Home Finance Agency Administrator (now the Secretary of Housing and Urban Development ("HUD")) "may ... sue and be sued." Pub.L. No. 81–171, § 106(c)(1), 63 Stat. 413, 418 (1949); *see Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 55 n. 5 (2d Cir.1985) (holding section 106(c)(1), though omitted from U.S.Code, was still valid, as it was never repealed). This waiver provides jurisdiction over suits brought by residents and commercial tenants displaced by urban renewal projects, whom the statute explicitly protected, § 105(c), 63 Stat. at 417. *See Norwalk Core v. Norwalk Redev. Agency,* 395 F.2d 920, 936 (2d Cir.1968) (holding displaced residents may sue both federal and local agencies as well as private developers under section 105(c) for failing to relocate them satisfactorily as provided for in the statute or as contractually required); *M. M. Crockin Co. v. Portsmouth Redev. & Hous. Auth.,* 437 F.2d 784, 787 (4th Cir. 1971) (holding commercial tenants unsatisfactorily accommodated may sue both federal and local agencies under section 105(c)).

■ Here, the Chenkins are not in the category of persons displaced by an urban renewal project. Thus, the question for the Court is whether a cause of action can be inferred from the Housing Act for their claims. To determine whether a statute implies a private right of action, courts apply a four-part test: (a) Does the statute "create a federal right in favor of the plaintiff," or does the plaintiff belong to the class that was the intended beneficiary of the legislation? (b) Does the record show any evidence of legislative intent to create or deny a remedy befitting the plaintiff? (c) Are the underlying purposes of the legislation consistent with implying a remedy? (d) Would inferring a federal cause of action interfere with state law? *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

Courts applying the *Cort* factors to claims under the Housing Act have widely held that no private cause of action exists for grievances other than those of displaced persons. *See, e.g., Perry v. Hous. Auth. of Charleston,* 664 F.2d 1210, 1215 (4th Cir.1981) (concluding no right of action exists for tenants in redevelopment project seeking relief against continued state of disrepair and health hazards); *Cedar–Riverside Assocs. v. City of Minneapolis,* 606 F.2d 254, 257–59 (8th Cir.1979) (same for private developer complaining of city's violations of the redevelopment

plan); *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1046–47 (9th Cir.1979) (same for adjacent city challenging an urban renewal project); *M.B. Guran Co. v. City of Akron*, 546 F.2d 201, 204 (6th Cir.1976) (same for contractor complaining of violations of competitive bidding guidelines).

The Chenkins' grievances are more removed from the provisions of the Housing Act than the grievances raised in these cases. Applying the *Cort* factors:

(a) The Housing Act makes no mention of future residents of a completed housing project.

(b) The legislative history shows that the Housing Act was designed to address post-war economic conditions, *see* S.Rep. No. 84 (1949), as reprinted in 1949 U.S.C.C.A.N. 1550, 1553, 1555, 1558. The Senate Report contemplated a twelve-year period ending in 1960 as the target for remedying present needs, *id.* at 1555, 1556, and emphasized that the bill could only provide a "sound foundation" for "a comprehensive housing program," *id.* at 1552. Congress clearly did not intend to remedy congestion in a successfully revitalized neighborhood some fifty years in the future.

(c) Congress revisited its housing policies and modified the Housing Act frequently in the following decades, thus making it difficult to infer any underlying purpose in 1949 that was to remain unexpressed.

(d) Because the Senate Report emphasized that the federal role was not to displace local decision making and managerial control, *see, e.g., id.* at 1551, deference is due to state and local law.

Therefore, I hold that the Housing Act does not provide a private cause of action for plaintiffs.

### b. Substantial Question of Federal Law

 The question remains whether the Chenkins' suit requires interpretation of the Housing Act and resolution of a "substantial federal question." *D'Alessio*, 258 F.3d at 99. "A case may 'arise under' a law of the United States if the complaint discloses a need for determining the meaning or application of such a law." *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir.1964), *cited with approval in D'Alessio*, 258 F.3d at 99. In *D'Alessio*, the court held that "arising under" jurisdiction existed to determine whether the New York Stock Exchange had complied with its "statutory duty" created by federal securities laws. 258 F.3d at 101. In *Greenblatt v. Delta Plumbing & Heating Corp.*, by contrast, the court held that no jurisdiction existed to determine whether the defendant had defaulted in its obligations to make payments on a surety bond, because that determination required construal of a collective bargaining agreement, not federal law. 68 F.3d 561, 570 (2d Cir.1995). This was true even though the collective bargaining agreement was itself a federal contract:

> While the agreement is a federal contract and is therefore governed and enforceable by federal law, in the federal courts, the agreement itself is not federal law. Thus, the fact that an element of the cause of action requires construction of the agreement does not present a federal question.

*Id.* at 570–71 (quotation omitted). The court noted that the bond in question "[was] not required by federal law" but was required by the collective bargaining agreement. *Id.* at 571.

Unlike the federal securities laws at issue in *D'Alessio*, the Housing Act imposes no obligations of its own. *Cf. Perry*, 664 F.2d at 1215 (concluding the Housing Act

is a "simple precatory statement[ ] of Congress's designs"); *West Zion Highlands v. City of Zion,* 549 F.Supp. 673, 676 (N.D.Ill. 1982) (Housing Act is "simply a statement of broad Congressional policy"). Although the Chenkins suggest it was Congress's intent that grants made pursuant to the Housing Act would effect a permanent disposition of the land to be redeveloped (*see* Pls.' Mem. of Law in Opp. to Dismissal Mot. 10), the only language they offer to support this idea is a reference in the Senate Report to an "ultimate solution," which in context refers specifically to the clearance of entrenched slums, not to any particular provision for the future.[6] This case, therefore, requires no interpretation of the Housing Act's "meaning" and "application." *Eliscu,* 339 F.2d at 827. The Housing Act's provisions for the future are made perfectly clear in the statute and legislative history. *See supra.*

The gravamen of plaintiffs' argument is a breach of the conditions attached to federal funds. This claim turns on interpretation of the Grant Agreement,[7] which, like the contract in *Greenblatt,* is a federal contract created pursuant to but not by requirement of federal law. Even if New York City were a defendant in this case, its duties, too, would be determined by construing the Grant Agreement, not the Housing Act.

Thus, plaintiffs' claims under the Housing Act present no substantial question of federal law.

### 2. The Grant Agreement

 I turn to whether the Grant Agreement supports a cause of action for the type of third-party beneficiary claims brought by the Chenkins. For the purpose of deciding defendants' jurisdictional challenge, I assume that the Chenkins are intended beneficiaries of the Grant Agreement.

 Jurisdiction under § 1331 exists over causes of action arising from contracts to which the federal government is a party, when sovereign immunity has been waived. *Up State Fed. Credit Union,* 198 F.3d at 375 n. 4 (2d Cir.1999) (citing *Falls Riverway Realty,* 754 F.2d at 55 n. 4). Such jurisdiction, however, may not be presumed to exist when a cause of action must be inferred from the contract or from the statute under which the contract arose, as in the instant case. Generally, state law and jurisdiction apply to the interpretation of any contract with the federal government that "does not bring into play rights or duties of the federal government." *Owens v. Haas,* 601 F.2d 1242, 1248 (2d Cir.1979) (citing, *inter alia, Miree v. DeKalb County,* 433 U.S. 25, 28–29, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977)). Furthermore, contractual rights created by federal statute are presumed not to confer federal jurisdiction. *Empire Healthchoice,* 547 U.S. at 698, 126 S.Ct. 2121 ("If Congress intends a preemption instruction completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear."). "Federal common law" and federal jurisdiction will apply to a third-party claim under a contract with the federal government when (a) "substantial rights and duties of the Unit-

---

**6.** "[T]he enactment of [Title I of the Housing Act] would permit an effective start and would for the first time in the history of the Nation give to slum dwellers, and to the American communities as a whole, firm and reasonable expectation for the ultimate solution of a condition which has borne heavily on them for decades." 1949 U.S.C.C.A.N. at 1565.

**7.** Plaintiffs acknowledge that the Manhattantown Agreement bars third-party lawsuits. (Compl.¶ 57).

ed States hinge on its outcome" or (b) uniformity of application is called for by the broad federal occupation of a field of law or by the purpose of the statutory scheme in question. *Owens,* 601 F.2d at 1248 (quoting, *inter alia, Miree,* 433 U.S. at 31, 97 S.Ct. 2490).

In *Owens,* a prisoner who was cooperating with the federal government alleged abuse in the temporary custody of a county jail. *Id.* at 1244. He claimed violations of the subsistence and care clause of the county's contract with the federal Bureau of Prisons, which was entered into pursuant to statute. *Id.* at 1244–45. The court held that the plaintiff was an intended beneficiary of the contract and had a federal cause of action to challenge the county's adherence to the contract. *Id.* at 1251. The court found that the United States had a substantial duty to safeguard the security of its prisoners and had created a broad regulatory scheme for doing so, thus creating a federal interest in uniform application of the law. *Id.* at 1249.

In contrast, when veterans of the Vietnam War brought common law claims against companies that supplied the United States with chemical weapons that the plaintiffs alleged had injured them, the court was unable to infer a federal right of action. *In re "Agent Orange" Prod. Liab. Litig.,* 635 F.2d 987, 988 (2d Cir.1980). The court in *Agent Orange* distinguished *Owens,* reasoning that the United States held competing interests in its war veterans and in its military suppliers and finding that Congress had not attempted to reconcile those competing interests. *Id.* at 994–95. The court reiterated the principle that "before federal common law rules should be fashioned, the use of state law must pose a threat to an 'identifiable' federal policy." *Id.* at 995 (internal quotation marks omitted).

Applying *Owens* to plaintiffs' claims here, I first examine the duties created by the Grant Agreement, which states that its purpose:

is to provide for the extension by the Government to the Local Public Agency of certain Federal financial assistance under Title I of the Housing Act of 1949 ... with respect to the Project, and to state the terms and conditions upon which such assistance will be extended and the understandings of the parties hereto as to the manner in which they contemplate that the Project will be undertaken and carried out.

(Housing and Home Finance Agency Contract No. UR N.Y. LG–4, § 1). In defining the project, the Grant Agreement specifies that the local public agency (the City) is to supervise its execution:

The Project shall consist substantially of the following:

(1) The acquisition by the Local Public Agency of all such land in the Project Area as shall be necessary to carry out the Project Redevelopment Plan (all land situated in the Project Area which is acquired or held by the Local Public Agency as a part of the Project being herein called "Project Land");

(2) The demolition and removal of any buildings and improvements in the Project Area to the extend necessary as aforesaid;

(3) The installation, construction and reconstruction of streets, utilities, and other site improvements essential to the preparation of sites in the Project Area for uses in accordance with the Project Redevelopment Plan; and

(4) The making by the Local Public Agency of Project Land available for development or redevelopment by private enterprise or public agencies (including sale, initial leasing, or retention by the Local Public Agency itself) at its

fair value for uses in accordance with the Project Redevelopment Plan.

(*Id.* § 4). The City is charged with carrying out the project alone or, in its discretion, together with a private developer. The federal government's duties appear limited to providing financial assistance.

The Grant Agreement further requires the City to ensure the developer's compliance with the land-use provisions of the Redevelopment Plan:

> When Project Land is sold or leased by the Local Public Agency, it will obligate the purchasers or lessees, as the case may be, (1) to devote such Project Land to the uses specified in the Project Redevelopment Plan; and (2) to begin and complete the building of their improvements on such Project Land within a reasonable time.

(*Id.* § 106(H)). The City's duty under this provision furthers the policies stated in the Housing Act. The City discharged the duty imposed on it here and went further: it bound not only the developer but future owners as well by including 40–year restrictive covenants in the Manhattantown Agreement and deed, thus ensuring a stable neighborhood and a complete realization of the Housing Act's vision.

The federal government, then, has no substantial interest or duty under the Grant Agreement that hinges on new building plans in the twenty-first century. *See Owens,* 601 F.2d at 1248. The Senate Report's emphasis on local decision making and managerial control, *see* 1949 U.S.C.C.A.N. at 1551, discussed above, supports this conclusion. So does an advisory letter from HUD submitted by defendants in this case. (Braun Decl. Ex. I ("[T]he [PWV] project is considered closed from HUD's perspective.")).

Applying the second factor of the *Owens* test, nothing in the statutory scheme indicates that Congress intended federal supervision over completed housing projects or residents' interests. The numerous decisions, discussed above, holding that the Housing Act did not create private remedies, support this conclusion. In fact, the Senate Report's emphasis on local control suggests that the Housing Act protects the interests of cities, which in the instant suit compete with plaintiffs' interests. *See Agent Orange,* 635 F.2d at 994–95.

Because the application of state law to the Chenkins' claims poses no threat to an identifiable federal interest, *id.* at 995, this Court has no jurisdiction and the suit is dismissed pursuant to Rule 12(b)(1).

## II. *Failure to State a Claim upon Which Relief May Be Granted*

Even if this Court has subject matter jurisdiction over plaintiffs' claims, their suit fails to state a claim upon which relief may be granted and must be dismissed pursuant to Rule 12(b)(6).

As discussed above, the Housing Act creates no private cause of action for plaintiffs, and thus plaintiffs lack statutory standing to bring their claims under the Housing Act. *See Alliance for Envtl. Renewal,* 436 F.3d at 87. Even if plaintiffs had standing to bring a claim under the Housing Act, the Housing Act makes no provision for future restrictions on land use that apply in this case, and plaintiffs have therefore failed to state a claim under the Housing Act.

Further, again as discussed above, the Grant Agreement was not intended to benefit distant generations of residents; plaintiffs are therefore not intended beneficiaries under federal law and have no standing to enforce the Grant Agreement. Even if plaintiffs are intended beneficiaries of the Grant Agreement, that document cannot be interpreted as establishing permanent restrictions on land use, and

plaintiffs have therefore failed to state a claim under it.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted, the complaint is dismissed with prejudice, and plaintiffs' cross-motion is denied as moot. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.